UNITED GAS PIPE LINE COMPANY, et al. *v.* JONES.

No. 40976 April 13, 1959 111 So. 2d 240

472

474

*Beard, Pack & Ratcliff,* Laurel, for appellants B. J. and Paul Townsend.

478

*Deavours & Hilbun,* Laurel, for appellant, United Gas Pipe Line Company.

*Melvin, Melvin & Melvin,* Laurel, for appellee.

480

KYLE, J.

This case is before us on appeal by the United Gas Pipe Line Company, B. J. Townsend and Paul B. Townsend, defendants in the court below, from a judgment of the Circuit Court of the First Judicial District of Jones County rendered in favor of Eddie Jones, a minor, plaintiff in the court below, who sued by his father J. L. Jones as next friend, as damages for personal injuries sus-

tained by the plaintiff as a result of an automobile accident which occurred on April 18, 1956, on a state-aid highway running westwardly from a point on U. S. Highway No. 11, in Jones County, to the Leaf River bridge. The appellants were named as defendants in the plaintiff's declaration along with Dawson Johnston, administrator of the Estate of David Lee Johnston, deceased, who was operating the automobile at the time the accident occurred.

The automobile involved in the accident was a new 1956 model Oldsmobile which was owned by the defendant B. J. Townsend, and was being used by his son Paul B. Townsend, a minor 14 years of age, with the permission and consent of his father. The accident occurred about 8 o'clock p. m. when the automobile, which was being driven by David Lee Johnston and in which Paul B. Townsend, and Eddie Jones were riding, rounded a curve in the black top highway and collided with a concrete post, which had been erected by United Gas Pipe Line Company as a pipe line marker, on the outer edge of the highway shoulder about three or three and one half feet from the edge of the pavement. All three of the boys were riding on the front seat of the car at the time the collision occurred. The car was being driven at a high rate of speed as it entered the curve and veered across the center line of the pavement onto the edge of the highway shoulder. The driver had reduced his speed, however, and was regaining control of movements of the car when it struck the concrete marker near the west end of the curve. The car turned over when it hit the marker, and David Lee Johnston was killed instantly. Eddie Jones was thrown from the car and was seriously injured.

The plaintiff alleged in his declaration that the United Gas Pipe Line Company was negligent in erecting the concrete marker in such close proximity to the black top portion of the highway; that the post was placed

in a highly dangerous position because of its close proximity to the traveled portion of the highway, and the pipe line company should have reasonably foreseen that the placing of such post in such position and allowing it to remain there would likely cause serious injury or death to travelers on the highway; that the public had a right to the exclusive use of said highway, and it was negligence and a violation of the law for the pipe line company to obstruct said highway by the erection of said concrete post. The plaintiff alleged that the defendant B. J. Townsend was negligent in permitting his son, Paul B. Townsend, who was only 14 years of age, to operate his car on the highway, knowing that his son was of immature age and could not be expected to exercise reasonable care and prudence in the operation of said automobile; that the said B. J. Townsend knew or should have known that the said Paul B. Townsend would likely turn the car over to or place it in the hand of some other person who was irresponsible, negligent and careless in its operation; that the said Paul B. Townsend did not have a driver's license and could not get a driver's license due to his age; and that these facts were known to the defendant B. J. Townsend at the time he permitted his son to operate his car on the highway. The plaintiff alleged that David Lee Johnston, who was operating the automobile with the permission and consent of the defendant Paul B. Townsend, was negligent in failing to use proper care and caution in the operation of the automobile, in that he was driving the same at such excessive and dangerous rate of speed that he was unable to control the movements of the car while driving on a curve in the highway; and that the defendant Paul B. Townsend, who was riding on the front seat of said automobile with the said David Lee Johnston, was negligent in permitting the said David Lee Johnston to operate said automobile in such negligent manner. The plaintiff charged that the injuries which

he had suffered as a result of the collision were proximately due to the combined and concurrent negligence of the defendants as set forth in the declaration.

The defendant Dawson Johnston, administrator of the Estate of David Lee Johnston, deceased, filed no answer or other pleading and was not represented by counsel during the trial. The other defendants filed answers in which they denied all liability for the injuries complained of in the plaintiff's declaration, and the case was tried before a jury at the November 1957 term of the Court. The jury, after hearing the testimony, returned a verdict for the plaintiff against all of the defendants, for the sum of $40,000, and a judgment was duly entered in favor of the plaintiff for that amount. From that judgment B. J. Townsend and Paul B. Townsend have prosecuted an appeal to this Court without supersedeas. The United Gas Pipe Line Company has prosecuted a separate appeal and has filed a supersedeas bond. Dawson Johnston, administrator, has filed no appeal.

The main points argued by the attorneys for the appellant United Gas Pipe Line Company as grounds for reversal of the judgment of the lower court are: (1) That the court erred in overruling the motion of the pipe line company for a directed verdict at the conclusion of all of the evidence; and (2) that the court erred in overruling the motion of the pipe line company for a new trial on the ground that the verdict of the jury was against the weight of the evidence.

The main points argued by the attorneys for the appellants B. J. Townsend and Paul B. Townsend are (1) that the court erred in failing to sustain the appellants' motions for a directed verdict in favor of each of the appellants, at the conclusion of all of the evidence, and in failing to sustain their motions for a new trial on the ground that the verdict of the jury was contrary to the overwhelming weight of the evidence; (2) that

the court erred in admitting testimony which showed that the appellant B. J. Townsend had allowed the appellant Paul B. Townsend to drive vehicles owned by B. J. Townsend on other occasions not connected with the occasion giving rise to this action; and (3) that the trial court erred in granting to the plaintiff certain unnumbered instructions specifically referred to in the assignment of errors.

It is therefore necessary that we give a brief summary of the testimony offered on behalf of the respective parties.

B. J. Townsend, who was called to testify as an adverse witness by the plaintiff, testified that he was the owner of the 1956 model Oldsmobile car which was involved in the wreck on April 18, 1956; that he had let his son, Paul B. Townsend, who was 14 years of age, have the car to drive to prayer meeting and a young people's party; that Paul had driver the car for him on other occasions, but that was the first time he had taken it out by himself. Townsend stated that he told Paul that he could have the use of the car, provided he did not go anywhere else; that he told Paul not to put the car on the highway, apparently meaning U. S. Highway No. 11; and that he told Paul not to let anyone else drive the car. Townsend also stated that he owned a Chevrolet pickup truck, and that Paul had driven the truck to football games and had purchased gasoline when he was driving the car for his father.

Paul B. Townsend, who was also called to testify as an adverse witness by the plaintiff, testified that he was 14 years old at the time of the accident; that he lived with his father about 2½ miles east of Moselle; and that he attended the Moselle High School. Paul stated that he got the keys to the new Oldsmobile from his father during the evening of April 18, 1956, and drove to Moselle, where he picked up Sam Farris, one of his buddies who lived on Highway No. 11; that he and Sam

then picked up several others who wanted to go to the prayer meeting; and they all drove back to the church. After the prayer meeting service was over, Paul and several other young people went to a party at the home of Mrs. N. B. Sexton. David Lee Johnston and Eddie Jones were at the party. Paul stated that he and David Lee talked about taking the new car out. David Lee asked him to do that. Paul agreed, and David Lee asked Eddie Jones to go along with them. Paul gave David Lee the keys to the car, and the three boys got in the car on the front seat. David Lee got under the steering wheel; Paul set next to him; and Eddie occupied the seat on the right side. Paul sat next to David Lee to show him how the car operated. They drove out of town, and across U. S. Highway No. 11, and about one mile northwest of Moselle they struck the black top road running westwardly from Five Point to the Leaf River bridge. David Lee said, "Let's see what it will do on take off." Paul said, "Just take off." David Lee was going about 35 miles an hour at that time. The Oldsmobile was equipped with four speed ranges. David Lee got the car up to a "pretty good speed." Paul remonstrated with him. As they entered the curve in the black top highway Paul looked at the speedometer. It registered at rate of speed of 90 miles per hour, and Paul told David Lee to "slow down." David Lee applied the brakes, and began to slow down when he entered the curve. The car swerved over on the left side of the highway and onto the shoulder, and was on the left side of the highway about two-thirds of the way around the curve when it struck the concrete post. Paul stated that the car was about one-half off the road at that time. Paul stated that he did not warn David Lee about the concrete post because he did not see it. When the car struck the post, it turned over, end over end. Paul stated that he was thrown out of the car, "and after that I don't remember * * * I know something happened

because that car turned over.'' Paul stated that he and his two companions intended to drive to the river bridge and turn around. David Lee was the one who said ''Lets see what it will do on take off.'' Paul stated that David Lee started losing control of the car to some extent when the car went into the curve. He tried to keep to the right around the curve, but he was just going too fast to stay on the right side. He was holding the shoulder at the time of the wreck—he was keeping it on the shoulder and inching it back to the right. David Lee was 18 years of age and had a driver's license. Paul stated that when he noticed the speedometer and saw that the car was going 90 miles an hour, he told David Lee to slow down, and Eddie Jones also told David Lee to slow down. David Lee slowed down, and started to putting on his brakes. Paul admitted that he did not have a driver's license. He also admitted that he drove his father's truck and the automobile whenever his father deemed it necessary.

Eddie Jones testified that he was 17 years of age at the time of his injury, and that he was attending the Moselle school. He stated that he attended the party on the night of April 18, 1956, along with Paul B. Townsend and David Lee Johnston. Paul had the keys to Mr. Townsend's new Oldsmobile car, and Paul and David Lee asked him to ride with them. Paul said, ''Come on and go, we will only be gone a few minutes.'' David Lee got under the steering wheel. Paul asked Eddie to let him ride in the middle, and Eddie got on the outside. They drove westwardly across Highway No. 11, and on to a graveled road running westwardly from Five Point to Leaf River bridge. When they came to the black top road, David Lee said, ''I want to show you how fast this car will take off until it comes out of second gear, how long it will stay in second gear until it comes in high gear.'' Eddie stated that he observed the speedometer when it changed gears, and the car was running

at a rate of speed of 65 miles per hour. He noticed later that the rate of speed was approximately 90 miles per hour. He asked David Lee to slow down, and just before they entered the curve the car was going 55 or 60 miles an hour. David Lee was slowing down fast. The car was on the south side of the road and was partially in the ditch and partially on the shoulder of the highway, when they crossed the gravel road which intersected the black top from the south a short distance east of the point where the wreck occurred. Eddie stated that David Lee had the car under control when it passed over the gravel road intersection, and the car had quit skidding when it hit the concrete post a few feet west of the intersection. Eddie stated that he saw the concrete post when the car was crossing over the gravel road. It was about three feet from the black top on the shoulder of the highway. He could not see the stob earlier because sedge brush had grown up around the stob. Eddie stated that the car hit the concrete post and turned over, and that was the last thing that he remembered. When he regained consciousness, he was in the ditch, and he heard Paul crying.

Glyn Holyfield testified that he went to the scene of the accident the next morning. He saw skidmarks across the small gravel road that intersected the black top from the south and on up the side of the ditch. There was a concrete stob or concrete marker just to the left of the black top road and just beyond the gravel road intersection. The concrete marker was 3 or $3\frac{1}{2}$ feet from the black top. He saw the concrete marker laying in the ditch on the left side of the road and the hole that it came out of. The hole was dug up. The post or stob had been pushed over in a westwardly direction. The marker had been broken in two parts about half or two thirds of the length up. It had reinforcement rods in it. The post was about four inches square. There were fragments of the post laying around the hole or

down in the ditch. The west line of the graveled road was about 12 or 14 feet from the hole. The shoulder of the black top road appeared to be about 2½ or 3 feet wide. The bottom of the ditch was about 1½ feet below the black top pavement. Holyfield stated that he observed the skidmarks extended back 35 or 40 yards east of the graveled road. There were two lines of marks. One line stayed on the pavement and the other was along the edge of the shoulder of the ditch. There was one tire mark on the south side of the black top up to the time the car got to the stob. He stated that the distance from the edge of the road to the center of the ditch was about 4 or 5 feet. The hole that the post came out of was about 1½ feet from the center of the ditch—just out of the ditch on the edge of the shoulder.

Garland Johnston, a brother of David Lee Johnston's father, testified that he went to the scene of the accident to make an investigation the morning after the accident occurred. He saw the concrete post or marker laying in the ditch. It appeared to have been broken off. The hole where it came from was approximately 3 or 3½ feet from the edge of the black top. The marker appeared to have been jerked out of the ground. It was made of concrete with four strands of reinforcing iron. On cross-examination by the attorney for the Pipe Line Company, Johnston stated that the concrete post was about 7½ feet from the point where the graveled road intersected the black top road. There were skidmarks out on the highway but the witness could not say how far they extended back eastwardly. He saw where the skidmarks went into the ditch, that was after they got passed the graveled road. Oscar Butler, who lived at Moselle, testified that he went to the scene of the accident the morning after it happened. He saw where the car had hit the concrete stob or marker. The stob had broken off and was laying in the ditch. The hole which it came out of was about 3 feet from the black

top, down on the shoulder of the road. The hole was about 12 feet west of the graveled road that intersected the black top road. On cross-examination, Butler stated that the only skidmarks that he saw was the ground torn up when the car hit the stob. He did not recall seeing any skidmarks on the black top east of the graveled road. Henry Myers testified that he arrived at the scene of the accident a short time after the accident occurred. Eddie Jones was lying in the ditch when he got there. David Lee Johnston's body was lying on the ground, and Paul B. Townsend was there. He returned to the scene of the accident the next morning and saw that the automobile had been going around the curve in the road and had hit the concrete marker. There was a piece of concrete laying in the ditch, and there was a hole about 3 or 4 feet from the edge of the black top. The marker had been broken in two parts. He observed skidmarks along the south side of the highway and across the graveled road.

Melford Sheldrick, a civil engineer, who was familiar with the black top road in question testified that the road was 18 feet wide from the edge of the mat on one side of the road to the edge of the mat on the other side, and 20 feet from prime to prime. The shoulder was 4 feet wide. He was asked whether a concrete marker of the kind referred to in the testimony, measuring 2 or 2½ feet in the ground and approximately 2 feet above the ground, and located 3 or 3½ feet from the shoulder of the black top, would be a safe or hazardous construction. His answer was that it would be a hazardous construction, even if the marker were located in the bottom of the ditch. G. B. Beard, a civil engineer, who had been employed at one time as a road engineer for Jones County, testified that he had prepared the original plans for the construction of the road running westwardly from Five Point to the Leaf River bridge, when the road was improved as a state-aid road. The right of way for the

highway was 60 feet wide at the point where the acci-. dent occurred. In answer to a hypothetical question, he stated that in his opinion the location of a 4'' x 4'' concrete post at a point 3 or 3½ feet south of the black top surface of the highway would not be safe for the traveling public.

Several witnesses testified that they had seen Paul B. Townsend driving his father's automobile and truck from time to time prior to the date of the accident.

Dr. Francis R. Conn, an orthopedic surgeon, testified that he saw Eddie Lee Jones in the emergency room at the Forrest General Hospital in Hattiesburg a short time after the accident. He was complaining of severe pains in the chest and shortness of breath. He was unable to move his legs. He saw at once that Eddie had a severe fracture of the spine itself. He found on examination that there was complete paralysis below the level of the fracture. Eddie remained in the Forrest General Hospital from April 18 to August 5. He had been paralyzed since the date of his injury, and the doctor saw no hope or probability of the boy's recovery. The paralysis, in his opinion, was permanent.

Mrs. Lloyd Jones, Eddie's mother, testified that Eddie remained in the Forrest General Hospital 109 days after his injury, and he had been practically helpless since his injury. He had been carried to Oschner's Clinic in New Orleans three times for examination and treatment. The first time he underwent a spinal operation, and was in the hospital 21 days. He had gone back later for physical therapy treatments. By agreement of the attorneys for the respective parties, the bills for hospital, doctors and medical expenses, aggregating approximately $7,000, were offered in evidence as exhibits to Mrs. Jones' testimony.

Seven witnesses were called to testify on behalf of the United Gas Pipe Line Company.

Rufus Duckworth, State Highway Patrolman, testified that he was notified of the accident and went to the scene of the accident a short time after it happened. No one involved in the wreck was there when he arrived. He stated that the automobile came to rest at a point about 4 or 5 feet from the black top roadway. He stated that he did not see the concrete post or the hole that the post had been knocked out of, and he made no report on the accident for the reason that the road was not a state highway. Fred Walters, Sheriff of Jones County, testified that he went to the scene of the accident that night a short time after it happened. He found the automobile just off "the small graveled road" about five feet south of the black top. He saw dug-out places in the turf along the south side of the road. The markings extended from 100 to 200 feet along the black top. There were marks on the turf that led to the automobile. The sheriff stated that he did not observe the concrete marker at that time, but the next afternoon he drove back out there, and he saw the marker which was broken and leaning over. The marker had been painted a reddish color. It was approximately four feet from the edge of the black top, just off the shoulder, to the best of his memory.

Hubert Bryant, a member of the board of supervisors for District No. 2, testified that the road in question was paved in May 1954. The pipe line was there several years before the road was paved. The road was widened and improved before it was paved. It was widened more on the south side than on the north side, and the ditch line was moved south approximately 8 feet. There was a pipe line marker on the bank south of the ditch before the road was widened. Bryant had been told that the marker had been placed there to keep the road machines from hitting the pipe line. The marker was taken up and laid aside when the road was widened; and when it was put back, it was placed just a little north of the

ditch, about 4 or 6 feet from the pavement. Bryant stated that the roadbed was 20 feet in overall width. The pavement was 18 feet wide, but there was one foot on each side of the pavement which was primed, and the shoulders dropped a little bit into a three-foot bottom ditch. The marker was about a foot and a half below the edge of the shoulder. The gas line company came there with a probe and probed down to where the gas line was, and Bryant supposed that the gas line company put the marker back. "We didn't put it back, he said.

S. A. Lovett testified that he lived on the highway running from Five Point to the Leaf River bridge and was familiar with the location of the pipe line at the time the accident occurred. He stated that the marker in question was put back on the pipe line after the road was widened just where it was before the road was widened, "only instead of it being on the outside of the road, it was on the inside of the road * * *. It was pretty close to the shoulder of the road, 6 or 8 feet from the pavement—I never measured it." Lovett stated that, at the time the road was built, he gave the county an easement to build the road. He had also given a right of way easement for the pipe line. The road was built several years after the pipe line was laid. He gave the county a right of way for the road and the county straightened it out. When the road was finished, "They moved the marker back on the pipe line." L. O. White, county surveyor, testified concerning measurements which he had made of distances from the western driveway eastward to the gravel road intersection with the black top highway and from the west edge of the gravel road back to the west edge of the easternmost gravel road referred to in the testimony of other witnesses. On cross-examination White was asked whether there was a concrete marker "in that hole" when he was out there. His answer was, "No, Sir, Bill Deavors pointed it out to me."

Jack Bynum, a member of the maintenance crew of the pipe line company, testified that the pipe line was built in 1930, and had never been moved. The pipe line at that time was 15 or 20 feet south of the road right of way. The concrete marker referred to by the witnesses was placed there in 1933 by the Southern Natural Gas Company, which owned the pipe line at that time. After the road was moved over farther south, the marker was put back in the same location, which was eight or nine feet south of the paved portion of the road. Bynum stated that he went to the scene of the accident the day after the accident occurred, and that he saw black marks along the paved road which extended over a distance of 100 or 150 feet. He saw the ground torn up along the edge of the road as the car left the black top pavement. Bynum stated that the marker, as it existed at the time of the accident, was outside of the traveled portion of the highway.

Bythel B. Harrington, another employee of the pipe line company, testified that he walked the pipe line on April 20, 1956. He found the pipe line marker which had been knocked down and damaged. He picked the marker up and put it back in the hole and packed dirt around it. No part of the marker had been broken off. Harrington stated on cross-examination that the marker was later put back in a different position from that it was in immediately after the wreck. Harrington was questioned about the photographs of the scene of the accident, which had been offered in evidence, and he was asked whether there was not a lot of broom sedge and other things along the south side of the highway which obscured or obstructed the new concrete marker. His answer was, "The marker could be seen over that little bit of grass there."

The appeal of the appellant United Gas Pipe Line Company and the appeal of B. J. Townsend and Paul B. Townsend are entirely separate appeals and involve

entirely different principles of tort liability. We shall consider first the appeal of the appellant pipe line company.

The main point argued by the attorneys for the appellant pipe line company as ground for reversal of the judgment of the lower court is, that the pipe line marked was lawfully located and maintained, and that the appellant pipe line company was guilty of no negligence which either caused or contributed to the accident. It is argued that the pipe line referred to in the record was constructed by the appellant's predecessor in title many years before the road running from Five Point to the Leaf River bridge was widened and improved as a paved highway; and that the pipe line was located 15 or 20 feet south of the curve in the old road, outside of the road right of way; that concrete markers were placed over the pipe line at that time as surface markers to indicate the location of the pipe line and to give notice to the general public that a high pressure natural gas pipe line was located beneath the surface; that the widening and straightening of the road several years later resulted in the concrete marker in question coming within the right of way of the improved highway; that the pipe line company was authorized by Section 2780, Code of, 1942, Recompiled, to construct said pipe line along and across the public highway and to erect said pipe line markers as stated above; that neither the board of supervisors nor the member of the board from the supervisor's district in which the road was located ever requested that the marker involved in this case be removed or relocated; and that the appellant was guilty of no negligence in placing the marker on the edge of the shoulder of the improved highway after the highway was completed.

But we think there was no error in the action of the trial judge in refusing to grant the peremptory instruc-

tion requested by the appellant pipe line company under the facts disclosed by the record in this case.

The record shows that the road running from Five Point to the Leaf River bridge was widened and improved as a state aid highway in 1954; that the highway right of way was 60 feet wide; and that the black top pavement was 18 feet wide with one additional foot on each side which was primed; that the marker with which the Townsend automobile collided had been taken up and laid aside when the road was widened and improved as a paved highway, but had been put back by the appellant pipe line company after the road was widened. The marker was a low concrete post reinforced with iron rods and set firmly in the ground. It was about 2½ feet high. It was located on the outer edge of the shoulder approximately 3 or 3½ feet from the edge of the black top pavement and about one foot below the level of the black top pavement. The plaintiff testified that the marker or ''stob'' was partially concealed from view at the time of the accident by sedge grass which had grown up around it, and the statement is substantiated by a photograph of the broken marker which appears in the record.

The legislature, by the enactment of Section 2780, Mississippi Code of 1942, Recompiled, has authorized pipe line companies to build and construct pipe lines and appliances along or across highways above and below grounds, ''but not in a manner to be dangerous to persons or property, nor to interfere with the common use of such roads.'' The authority granted in that section is also subject to two other conditions namely: (1) That ''the board of supervisors of any county through which any such line may pass, shall have the power to regulate, within their respective limits, the manner in which such lines and appliances shall be constructed and maintained on and above the highways and bridges of the county,'' and (2) that ''all such companies * * * shall be responsi-

ble in damages for any injury caused by such construction or use thereof.''

''Obstructions in a highway may be authorized by act of legislature, or by the municipality in which the road lies. Such authority, however, must be strictly construed and cannot lawfully be exercised in such a manner as to constitute a source of danger to the public, or prevent the ordinary use of the highway.'' 40 C. J. S., 217, 218, Highways, par. 220.

The appellant had a right under the above mentioned statute to build and construct its pipe lines and appliances along or across the public highways above or below grounds, ''but not in a manner to be dangerous to persons or property, nor to interfere with the common use of such roads.'' But a license to make a particular use of the highway, otherwise unlawful, while it exempts the licensee from the liability which would otherwise exist for injuries irrespective of the question of his negligence, does not exempt him from the duty of taking proper precautions to prevent injuries therefrom to persons using the highway. 40 C. J. S., 287, Highways, par. 252.

It is not claimed that the board of supervisors authorized the placing of the marker on the edge of the shoulder of the improved highway after the road had been widened and made ready for the black top surfacing. And indeed the board of supervisors would have had no authority to grant permission to the pipe line company to place such post or marker on the traveled portion of the highway or in such close proximity thereto as to constitute an obstruction dangerous to anyone properly using the highway, if such permission had been requested.

''Highway officers have no power to surrender the use of the highway for private purposes, or to authorize a nuisance on the highway. If the public authorities, in authorizing an obstruction, exceed their powers, such obstruction will be illegal; * * *.'' 40 C. J. S., 218, Highways, par. 220, and cases cited.

██ █ Any unauthorized obstruction which unnecessarily impedes or incommodes the lawful use of a highway is a public nuisance at common law. Elliott, Roads & Streets, 2d Ed. Sec. 644.

"Even though the entire width of a highway is not prepared for travel, or although a bridge or culvert does not extend to its entire width, the public rights of passage are not thereby limited in favor of one who places an unauthorized or improper structure within the highway limits, nor is the latter relieved from liability for injuries resulting therefrom by reason of the fact that such obstruction is outside the traveled way." 25 Am. Jur., 809, Highways, par. 527.

"One is not justified in obstructing a highway because he leaves sufficient room for the passage of the public. An obstruction placed anywhere within the highway limits, although outside of the traveled part, may constitute a nuisance. The same is true of any object placed close to the roadway, constituting a present source of danger. 40 C. J. S., 214, Highways, par. 218.

In Appalachian Power Company v. Wilson (1925), 142 Va. 468, 129 S. E. 277, the Court said: "A municipality has discharged its full duty to the public when it exercises proper care to provide and maintain a reasonably safe road of a reasonably safe width for public travel. But the law forbids any person, or corporation, to place or maintain any dangerous obstruction in any portion of a road which has been dedicated to and is being used for public travel."

██ █ In Mathews v. Thompson (Miss. 1957), 95 So. 2d 438, the Court held that a traveler using a completed highway is expected to use only ordinary care, and one who without right or authority, creates or maintains in, upon, or near a highway a condition which endangers safety of travelers does so at his own peril and is liable for injuries proximately resulting therefrom. The Court in its opinion in that case said:

"Highway No. 12, being a completed highway, the traveler was expected to use only ordinary care. In Graves v. Johnson, supra, (179 Miss. 465, 176 So. 256), it was held that, on such a highway, he has the right to assume that it is in a reasonably safe condition for travel, is free from obstructions, and he need not keep his eyes constantly fixed on the path of the highway, or look ahead for defects which should not exist. Besides, as a general rule, 'one who, without right or authority, creates or maintains in, upon, or near a highway a condition which endangers the safety of travelers does so at his own peril and is liable for injuries proximately resulting therefrom * * *.' 25 Am. Jur., Highways, Sec. 361, page 654.''

In the case of Southern Pacific Company v. Raish (U. S. Ct. App. 9th Ct. 1953), 205 F. 2d 389, the court held that it was negligence for anyone to construct or maintain any object over the shoulder of a highway so that there would not be sufficient clearance for lawful vehicles. In its opinion in that case the Court said: ''Appellant seems to argue that ordinary use of the highway comprehends the paved lanes to the exclusion of the shoulders and that it had no duty of providing clearance above the shoulders. It seems so obvious that the shoulders of a highway are for the use of traffic when circumstances indicate their usefulness that more than the statement to that effect is surplusage.''

In Cambridge Home Telephone Co. v. Harrington (1933), 127 Ohio St. 1, 186 N. E. 611, the Court held that the telephone company must not prejudice superior rights of the traveling public by posts erected within the right of way of the highway, and in its opinion in that case the Court said: ''The highway is primarily constructed for purposes of travel, and not as a site for monuments, billboards, telephone or telegraph poles, or any other device that may create an obstruction within the limits of the right of way. The Legislature must have had this rule in mind when it enacted section 9170, General Code.

The last clause of that section, 'but shall not incommode the public in the use thereof,' is a danger signal to public utilities using the highways for their own private purposes. They are placed upon notice, to the effect that, if they erect 'posts, piers, and/or abutments' within the right of way of the highway, they must not prejudice the superior rights of the traveling public in so doing.''

In Peninsular Telephone Company v. Marks (1940), 144 Fla. 652, 198 So. 330, the Florida Court in discussing a statute similar to own said: ''In construing similar statutes, other jurisdictions have held that posts and fixtures of telephone and telegraph companies may be erected and maintained on or near highways and streets and generally are not liable for the damage to persons or property resulting from a road vehicle striking such post, unless it is erected on the traveled portion of the highway or in such close proximity thereto as to constitute an obstruction dangerous to any one using the highway, and the location of the post is the proximate cause of the collision.''

The appellant's attorneys argue, however, that the pipe line company should not be held liable in this case for the reason that the proof shows that the negligence of the driver of the vehicle in which the appellee was riding was the sole proximate cause of the accident; and the appellant's attorneys cite in support of their contention on this point the cases of Gulfport and Mississippi Traction Company et al. v. Manuel et al. (1920), 123 Miss. 266, 85 So. 308, and Mississippi Power Company v. Sellers (1931), 160 Miss. 512, 133 So. 598. But the facts in each of those cases were entirely different from the facts shown by the record in this case. Those cases involved injuries resulting from collisions with the poles of electric power companies which could be readily seen from a distance by motorists approaching from either direction along the highway. The Manuel case was decided prior to the enactment of Chapter 291, Laws of 1922, which ap-

pears in its amended form as Section 2780, Code of 1942, supra; and the record in that case showed that the municipality had authorized and directed the electric street-car company to erect its guy wire poles between the traveled way and the sidewalk about 3½ feet from the outer limit of the traveled way. The Court held that the proof failed to show liability against either the city or the traction company which had placed its guy poles between the shell road and the north property line of the street in accordance with the directions of the city. In the Sellers case, the record showed that the truck in which the appellee was riding collided with a pole which had been erected by the power company within the road right of way eight feet from the traveled portion of the road, which the opinion states was "about as far from the traveled way as possible and at the same time be wholly upon the public land." The wreck occurred during the daylight hours. The Court in that case reversed the judgment in favor of the plaintiff, but in its opinion said: "Let it be understood that we have not dealt with a case where poles have been erected in the traveled or used portion of a highway that might be dangerous or interfere with the common use of the public highway."

It can be readily seen that the facts in each of those cases are clearly distinguishable from the facts in this case.

■■■ As stated by the Court in the American Creosote Works of Louisiana v. Harp, 215 Miss. 5, 60 So. 2d 514, there may be more than one proximate cause of an injury, 38 Am. Negligence, Sec. 63, and if the appellant's negligence proximately contributed to the injury, as the jury has found that it did, then the appellant is liable even though its negligence was not the sole proximate cause thereof. Brewer v. Town of Lucedale, 189 Miss. 374, 198 So. 42; Gulf Refining Co. v. Brown, 196 Miss. 131, 16 So. 2d 765; Planters Wholesale Grocery v. Kincaide, 210 Miss. 712, 50 So. 2d 578.

In Cumberland Tel. and Tel. Co. v. Woodham, 99 Miss. 318, 54 So. 890, the Court, in discussing the question of proximate cause, said: ''Without attempting to define proximate cause in such terms as will be applicable to all states of fact—for to do so is practically impossible—it will be sufficient to say that the negligent act of a person, resulting in injury, is the proximate cause thereof, and creates liability therefor, when the act is of such character that, by the usual course of events, some injury, not necessarily the particular injury, or injury received in the particular manner complained of, would result therefrom, provided the attendant circumstances are such that an ordinarily prudent man ought reasonably to have anticipated that some injury would probably result from the act done. In order that a person may be liable for damages resulting from his negligence, it is not necessary that his negligence should have been the sole cause of the injury. His negligence may be the proximate cause, where it concurs with one or more causes in producing an injury, and, although the author or authors of such cause or causes may also be liable therefor. 29 Cyc. 492-496, inclusive, and authorities there cited. 'If a defendant is negligent, and this negligence combines with that of another or with any other independent intervening cause, he is liable, although his negligence was not the sole negligence, or the sole proximate cause, and although his negligence, without such other independent intervening cause, would not have produced the injury.' Susie B. Harrison v. Kansas City Elec. Light Co., 195 Mo. 606, 93 S. W. 951, 7 L. R. A. (N. S.) 293.''

In the case that we have here we think that it cannot be said that an ordinarily prudent man could not have reasonably anticipated that, by the usual course of events, some injury, not necessarily the particular injury, or injury received in the particular manner complained of in this case, would result from the placing of the concrete

marker on the edge of the shoulder of the highway in the manner disclosed by the record in this case.

 Whether the pipe line company was negligent in placing the concrete marker referred to above on the highway right of way in a manner to be dangerous to persons using the highway, or to interfere with the common use of the road, and whether such negligence, if any, was a proximate or contributing cause of the plaintiff's injuries were questions for the jury to decide; and we think there was no error in the court's refusal to grant the peremptory instruction requested by the pipe line company. We also think there was ample evidence in the record to support the jury's findings against the pipe line company, and there was no error in the court's action in overruling the appellant's motion for a new trial.

We shall now consider the appeal of the appellants B. J. Townsend and Paul B. Townsend.

We think there was no error in the court's refusal to sustain the appellants' motions for a directed verdict in favor of each of the appellants at the conclusion of all of the evidence or in refusing to grant the peremptory instructions requested by the appellants.

It is admitted that Paul B. Townsend was a minor of the age of 14 years at the time of the accident, and that he was in possession of his father's automobile with the permission and consent of his father. He had no driver's license, and was disqualified under Section 8093, Miss. Code of 1942, Recompiled, from obtaining a driver's license. It was negligence on the part of B. J. Townsend to permit his son, Paul B. Townsend, who was under the age of 15 years, to drive his automobile on the highway, in violation of Section 8111, Code of 1942, recompiled. B. J. Townsend was legally liable for any injury inflicted as a proximate result of the negligent operation of the automobile by Paul B. Townsend. Somerville v. Keeler, 165 Miss. 244, 145 So. 721.

██ ██ Section 8093, Code of 1942, Recompiled, expressly provides that no operator's license, to operate a motor vehicle on the highways of this state, shall be issued to any person under the age of 15 years. A statute fixing the age required of automobile drivers is a legislative determination that a child under that age does not possess sufficient judgment and discretion to operate such vehicles. Millar v. Semler (1931), 137 Ore. 610, 2 P. 2d 233, 3 P. 2d 987. One who knowingly intrusts his automobile to a person under the statutory age is liable for injury resulting from the latter's negligence, without proof of the minor's actual incompetence. Wilcox v. Wunderlich (1928), 73 Utah 1, 272 P. 207; Hopkins v. Droppers (1924), 184 Wis. 400, 198 N. W. 738, 36 A. L. R. 1156.

 Permitting a child, of an age forbidden by statute to drive, to operate a car has been held to constitute negligence on the part of the parent; Paschall v. Sharp, 215 Ala. 304, 110 So. 387 (1926); Repczynski v. Mikulak, 93 Ind. App. 491, 157 N. E. 464 (1927); Burrell v. Horchem, 117 Kan. 678, 232 P. 1042 (1925); Roark v. Stone, 224 Mo. App. 554, 30 S. W. 2d 647 (1930); Walker v. Klopp, 99 Neb. 794, 157 N. W. 962 (1916); Taylor v. Stewart, 172 N. C. 203, 90 S. E. 134 (1916), Somerville v. Keeler, 165 Miss. 244, 145 So. 721 (1933).

In Somerville v. Keeler, supra, the Court said: "It was negligence on the part of the appellees to permit their daughter, under the age of fifteen years, to drive their automobile on the streets of the City of Cleveland in violation of the city ordinance; but, in order for this negligence to be an element of liability for the injury inflicted, it must appear that this negligent act was a proximate contributing cause of the injury. Rowlands v. Morphis, 158 Miss. 662, 130 S. 906."

 It is argued, however, that the appellant B. J. Townsend permitted his son to use the automobile under express instructions not to go upon the highway, and not

to let anyone else drive it, and that there was no causal connection between the restricted permission given by B. J. Townsend to his son, Paul B. Townsend, to use the car, and the subsequent accident, which was caused solely by the negligence of David Lee Johnston or the combined negligence of David Lee Johnston and the United Gas Pipe Line Company. But we think that B. J. Townsend was not relieved from liability for his negligence in permitting the use of his motor vehicle by his immature son, who was under age and prohibited by law from driving a motor vehicle on the public highway, when he exacted a promise from Paul that he would not drive the automobile on the highway and that he would not permit anyone else to drive the automobile.

"When a parent places his immature child in charge of an automobile, and injury follows as a direct result of the careless operation of the automobile, the parent becomes answerable for damages, not upon the basis of family relationship, or necessarily upon that of principal and agent, but by reason of his culpability in making it possible for the child to occasion harm." Atkins v. Churchill, (1948), 30 Wash. 2d, 859, 194 P. 2d 364.

Neither do we think that B. J. Townsend was relieved from liability, when Paul permitted David Lee Johnston to take his seat under the steering wheel and operate the car while Paul sat beside him. Some courts have held that where the owner's child is in possession of the motor vehicle under such circumstances as to impose liability on the parent for the child's act, and the child permits a third person to operate the car while the child is present, such third person's negligence is the negligence of the child and is chargeable to the owner. 60 C. J. S., 1079, Motor Vehicles, par. 434(a).

In the case of Wilson v. Moudy (1938), 22 Tenn. App. 356, 123 S. W. 2d 828, the Court held that, although it is the general rule that a minor may not be made liable for the tortious acts of one to whom he has undertaken to

delegate authority to act as his agent, the rule does not apply where the driver of an automobile was acting in the immediate presence and subject to the direction of the minor who had authority to control his operation of the car. In Haynie v. Jones (1939), 233 Mo. App. 948, 127 S. W. 2d 105, the Court held that an act done by a person in the presence of another and by his direction or with his consent is not regarded as the act of an ''agent'', but is the direct act of the person by whose direction it is done; and that in an action for the death of a pedestrian who was killed when struck by an automobile which was being driven by the guest of the minor son of the owner who was sitting in the front seat and assisting in driving, the question of liability of the minor son of the owner was for the jury. See also Scott v. Schisler et al. (1931), 107 N. J. Law 397, 153 A. 395.

In Woodson v. Hare (1944), 244 Ala. 301, 13 So. 2d 172, the Court said: ''Where a permissive user of an automobile occupies the car at the time of the collision, she is liable for the negligence of the driver if (1) she has not abandoned her right to control the car, or (2) if she exercises or has a right to exercise any control over the driver or the operation of the car, or (3) if the ride is for her benefit or for the mutual benefit of herself and the driver.''

In the case of Taksen v. Kramer (1933), 263 N.Y.S. 609, 239 App. Div. 756, the Court held that an infant may be held civilly liable for damages caused by his tortious acts. In its opinion in that case the Court said: ''At the time of the instant transaction defendant Dollinger was concedely an infant. It is elementary in this state that an infant may be held civilly liable for damages caused by his tortious acts. The complaint sufficiently alleges that defendant Kramer, operating the automobile in the presence of defendant Dollinger and under and pursuant to his authority, direction, and control, willfully, maliciously, and negligently struck the plaintiff causing him in-

jury. Defendant Kramer in so acting not only subjected himself to liability but also acted as the alter ego of defendant Dollinger. It is as if defendant Dollinger had acted himself and the complaint is good. Robbins et al. v. Mount et al., 33 How. Prac. 24; Sikes v. Johnson et al., 16 Mass. 389.''

■■ We are of the opinion that Paul Townsend and B. J. Townsend were both liable for the injuries resulting from the accident, although Paul was not personally at the wheel when the automobile collided with the concrete marker. B. J. Townsend was negligent in intrusting the possession and control of the car to an immature minor, who was prohibited by law from operating the car. Paul was negligent in that he, having the sole right of control of the car at the time in question, and being present in the front seat and assisting and directing its driving, failed to exercise any effective control or take any timely action to prevent the driver of the car from operating it at an excessive and highly dangerous rate of speed. Paul testified that he sat next to David Lee to show him how the car operated; and, when David Lee said, ''Let's see what it will do on take-off,'' Paul said, ''Just take off.'' Paul was in effect using David Lee as an instrumentality of his assisting him in driving and operating the car, and he and David Lee were jointly driving it. It was not until the speedometer registered 90 miles per hour that Paul said ''Slow down.'' David Lee's negligence was Paul's negligence, and Paul's negligence was the negligence of his father; and there was no error in the court's refusal to sustain the appellants' motions for directed verdicts at the conclusion of the plaintiff's evidence or in the court's refusal to grant the peremptory instructions requested by the appellants at the conclusion of all of the evidence.

■■ We also think there was no error in the court's action in admitting testimony which showed that the appellant B. J. Townsend had allowed Paul to drive auto-

mobiles owned by him on other occasions. The remaining assignments of error relate to certain instructions granted to the plaintiff. We have carefully examined each of the instructions complained of, and we find no reversible error in any of them.

The judgment of the lower court is therefore affirmed as to the appellant United Gas Pipe Line Company and also as to the appellants B. J. Townsend and Paul B. Townsend.

Affirmed.

*McGehee, C. J.,* and *Hall, Lee* and *Holmes, JJ.,* concur.