Mrs. Margaret G. **BURCHFIELD** et al., Plaintiffs,

v.

**Robert B. SMITH, d/b/a The Universal Southern Company, Defendant.**

No. GC 6610.

United States District Court
N. D. Mississippi,
Greenville Division.

Jan. 17, 1969.

Ross R. Barnett, Barnett & Barnett, Jackson, Miss., Pascol J. Townsend, Jr., Townsend, Welch & Terney, Drew, Miss., for plaintiffs.

J. Albert Lake, Jr., Lake, Tindall & Hunger, Greenville, Miss., for defendant.

## OPINION

ORMA R. SMITH, District Judge.

This case is before the Court for decision on the record herein, including the transcript of the trial proceedings. The case was tried by The Honorable Claude F. Clayton, United States District Judge, without a jury, on October 26th and 27th, 1967, at Greenville, Mississippi. The Court has carefully considered and reviewed the record and briefs of counsel in the case.

## FINDINGS OF FACT

On August 30, 1963, at about 6:30 a. m. o'clock, Elmer Hugh Burchfield left Drew, Mississippi, for Belzoni. He drove a pickup truck belonging to his employer, Earl Shurden, who lived at or near Drew. Miles Riley and Pete Jones,

also employees of Shurden, accompanied him on this journey. Burchfield, Riley and Jones worked for Shurden on occasions at his tractor and implement company in Belzoni.

Mr. Burchfield drove the pickup, Riley sat in the middle, and Jones on the other side. In travelling to Belzoni, Burchfield drove south on Highway 49W, to Ruleville, and thence to Doddsville. Highway 49W crosses Highway 442 at right angles at Doddsville. There is a traffic light at this intersection. Highway 49W runs north and south. Highway 442 runs east and west. It was raining when Burchfield left Drew and continued to rain until he reached Doddsville, when he was involved in an accident with the truck.

Defendant, Robert B. Smith, doing business as The Universal Southern Company, entered into a contract with the town of Doddsville to construct a municipal water system to serve the inhabitants of the town. Defendant started work on the project the week of August 10, 1963.

The contract called for the installation of a water line under Highway 49W. This was to be accomplished by boring a hole under the highway, in which a 20 inch steel casing pipe would be placed and through which a six inch cast iron water line would be run. This was to be accomplished by boring and jacking. The line was to be placed under the highway at the first expansion joint in Highway 49W north of the intersection. This joint is shown on the survey of the intersection prepared by the witness Burle and introduced in evidence as Defendant's Exhibit 6 to be located in Highway 49W seventy feet north of the traffic light at the intersection.

A subcontractor employed to bore the hole under the highway began this work on August 19th or 20th. In preparing the job it was necessary to excavate a pit for the boring rig, which was approximately four feet wide and nine feet long. The pit had to be excavated to a depth necessary to obtain the minimum clearance underneath the highway pavement set by the highway department and shown on the plans for the project. The rig consisted of an auger driller set in the pit, operated by a gasoline motor. In making the excavation, the dirt removed from the trench was placed at the back and on the sides of the trench. The trenches on each side of Highway 49W had been excavated prior to August 30th, the day Burchfield started on his trip from Drew to Belzoni. Large mounds of dirt had been placed on the right of way of Highways 49W and 442 and are shown in the photographs introduced in evidence. Those on the east and west sides of Highway 49W are directly across the highway from each other.

The mound of dirt on the west side is twenty-four feet from the pavement. The mound on the east side is nearer the pavement than the one on the west side. It is located near the gravelled entrance and parking lot of a service station situated in the northeast corner of the intersection. The evidence in the record is meager as to the exact location of this dirt and the trench from which it was excavated. The evidence consists mainly of photographs introduced for the purpose of showing the condition of the highway at the time of the accident.

The west shoulder of Highway 49W is heavily sodded with grass and slopes into a shallow drainage ditch on that side of the highway, the banks of which are likewise sodded with a heavy growth of grass. The ditch at its nearest point to the highway is twenty-four feet from the west edge of the pavement. The trench is constructed east and west at right angles to the highway, and the east end is situated at or near the ditch. The dirt taken from the trench was thrown to the side and rear of the trench and none of it was placed on the shoulder of the road between the ditch and the highway. At the time of the accident in which Burchfield's truck was involved, there were three twenty-inch steel casing pipes twenty feet in length lying in the ditch parallel to the high-

way, one on top of the other. There was not any material or machinery along the west side of the pavement on the shoulder of the highway between the drainage ditch and the highway, except this pipe located as aforesaid. This area was sodded with a heavy growth of grass.

There is a utility pole situated a few feet north of the mound of dirt and a short distance to the west of the drainage ditch where the three sections of steel casing pipe were lying in the ditch on the occasion in question.

The Lion Oil Service Station situated in the northeast corner of the intersection is situated about one hundred fifty feet north, on Highway 49W, of the traffic light. There are gravel drives which lead from the station into Highway 49W. An island is situated next to the intersection on this corner. The south drive leads into the highway north of this island. The dirt on that side of the highway was situated in or near this island. There is also a gravel drive on the south leading from this service station into Highway 442, east of the island above mentioned. The area to the south of and around the service station is used as a parking lot. Defendant traded with this station and stored his equipment, when not in use, on this lot, moving it in and out at intervals.

There is an island in front of this station, between it and the paved portion of the highway. On the north side of this island there is a drive, the center of which is approximately two hundred feet from the traffic light at the intersection.

Approximately four hundred fifty feet north of the traffic light on Highway 49W an asphalt road leads to the west from the highway. There are no obstructions on the shoulder of the highway between the pavement and the drainage ditch above mentioned between this road and the intersection, except a church sign and a road sign at the intersection, neither of which are important in the decision of this case.

The equipment which defendant had on the job consisted of an industrial tractor with a backhoe attachment on the rear and a bucket on the front, a ladder-back trencher, a high lift, a two-ton crane truck, a small bulldozer, and various kinds of hand equipment. This equipment was stored on the parking lot of the Lion Service Station when not in use. It was moved in and out when work was being performed on the job, and, on occasions, entered and left the highway on the gravel drive adjacent to the mound of dirt on the east side of Highway 49W. The proof showed this dirt to be gumbo, which becomes slick when it gets wet.

Burchfield and at least one of the men who were with him on August 30th travelled from Drew to Belzoni on the day before. They travelled Highway 49W, going through this intersection, on the way to and from Belzoni. The conditions at this intersection on August 29th did not change to any appreciable extent before the August 30th trip. It was not raining on August 29th.

The Burchfield truck approached the intersection of Highway 49W with Highway 442 at Doddsville at approximately 6:15 or 6:30 a.m. The truck went out of control, left the pavement on the west side of the highway, crossed the shoulder, and struck the three twenty-inch steel casing pipes in the ditch and was thrown against the utility pole. Burchfield sustained serious injuries, as the result of which he soon expired.

Riley, one of the occupants of the truck, testified at the trial that as they approached the intersection at Doddsville, Burchfield was driving the truck at a rate of speed 25 to 30 miles per hour; that the road was wet and muddy; that the mud on the highway was located at the red light and extended a short distance north of the light; that as they approached the intersection the green light suddenly changed to red, and Burchfield suddenly hit and applied the brakes of the truck, which caused it to slide off the west side of the highway

into pipes situated west of the bottom of the drainage ditch; that there was not anything on the shoulder of the road between the pavement and the drainage ditch except the pipes; and that the truck left the highway at a point between the fresh excavations on each side of the highway and came to rest near the utility pole situated northwest of the fresh excavation on the west side, with a pipe between the truck and the pole.

There were numerous variations in the testimony given by him on the trial and that given in a pretrial deposition. Suffice it is to say that when all of his testimony is considered it is uncertain as to the extent and location of the mud on the highway and the distance from the intersection when the brakes were first applied and the truck began to slide. In his deposition this witness testified the mud was situated in the highway near the traffic light and that he did not know whether or not the truck hit the mud before leaving the highway. He also testified at the trial that he did not know whether the truck skidded through some of the mud before it left the highway.

J. H. Fletcher, an attendant at the Lion Service Station, witnessed the accident. He was walking along the west side of the highway near the service station when the truck passed him and sloshed water on him as it passed. Fletcher was used by defendant to place flares each night on the side of the excavations dug by defendant. Fletcher testified that on the morning of August 30th he was walking south on the shoulder of the west side of Highway 49W and that as he came close to the station he started across the road to his work when the truck passed him, ran off the road, got back on the road, and then afterwards left the highway. The point at which this witness says he was standing is shown by the survey in evidence to be approximately 190 feet from the traffic light.

Fletcher's testimony leaves a confused opinion as to the exact manner in which the truck left the highway, but he final-

ly said that the truck hit the utility pole and came to rest there. He also testified that there were some pipes on the west side of the highway down in the drainage ditch; that there was a little dirt on the highway where the accident occurred, left there by defendant in moving the equipment back and forth across the road; that the dirt at the intersection was gumbo dirt which becomes slick when it is wet; that he had noticed some dirt, but not too much, before the accident occurred, a "little bit"; that the defendant regularly cleaned the dirt off the highway, but there was not much dirt on the highway the evening before the accident; and that defendant did not need to clean it off; that the truck left the highway the last time about where the pipe line was being installed under the highway; that the highway appeared that morning as shown in a photograph being Plaintiff's Exhibit 19, "just a little grass was knocked on there" by the truck Burchfield was driving; that the smudge pots or coaloil lamps which he put out the evening before the accident, except for one which had been knocked into a trench by the truck and the water had put it out, were burning the next morning.

In describing how the truck left the road on cross-examination, Fletcher testified that the truck first left the road on his side before the truck had reached him. Fletcher thought it was someone trying to scare him. After the truck passed Fletcher started across the road to the north drive of the service station, stopped in the middle of the road, and looked at the truck. By this time the truck had moved back on the road, had reached the red light; whereupon, the truck "ducked back this way—then it just leaped".

On cross-examination, this witness admitted that in his deposition, in answer to the question "Now, you stated that the truck skid, were you watching it when it first started into the skid?", he testified "Yes, sir. It looked like to me when he looked up and seen the light

was going to change—looked like he just hit his brakes all at once and the truck just leaped around. It just got up off the side and leaped around."

Fletcher was asked on cross-examination if he testified in his pretrial deposition that the truck had not quite reached the mud in the highway (at the time of the accident). The witness denied this testimony. The deposition reflects that he testified that before the truck reached the Lion Service Station the left hand side of the truck's back wheel went off on the grass and the truck had not quite reached the mud.

With further reference to the location of the mud in the highway, Fletcher testified that most of it was on the highway just before you reached the traffic light, where the excavation was being done, and when asked if the truck went through this mud before it skidded on the highway, Fletcher said, "Well, it was right along—right where it was at."

Leon Coleman, the operator of the Gulf Service Station situated in the southeast corner of the intersection, was standing in front of his station at the time of the accident and saw the occurrence. In describing the accident, Coleman testified, "When I was standing there looking up the road, I seen this truck went to sliding, and it slid off the road into a pipe that they had lying in the ditch there on the side of the road, and it ran into the end of it and it just sailed the pickup up in the air and brought it back and hit the post like that and placed the pickup back north." Though it is apparent that Coleman first saw the truck just as it started to sliding, and had very little opportunity to judge its speed, he estimated it to be 30–35 miles per hour. Coleman further testified that a little mud fell off defendant's equipment used in the work, and that it extended a hundred or hundred and fifty feet from the red light at the intersection. When asked how thick and scattered was the mud, he said it was scattered and in little small puddles. He also said there was mud up

and down the road where defendant had travelled with his machinery. He did not say how far this travelling extended from the intersection. Coleman estimated that the truck left the road 10 to 15 feet north of the place where the line was being installed under the highway, and at this place there was scattered mud on the highway.

Coleman admitted on cross-examination that in his pretrial deposition he stated that the first time he noticed mud on the highway was when he went out there. The reasonable inference from this statement is that this had reference to the occasion when he went to the scene after the accident. He also admitted that he testified in the deposition that he did not notice the mud the day before.

Witnesses Riley, Fletcher and Coleman testified on behalf of plaintiffs. The only other witness to the accident who testified was Curtis Williams, the operator of the Lion Service Station and he testified for the defendant.

Mr. Williams testified that he was standing in the front part of his station, at the end of the counter, when he saw the truck sliding down the borrow pit on the west side of the highway, at a point opposite the north drive to his station. He went to the scene and found the truck sitting by the power pole headed north. Somewhere between the power pole and where the truck left the highway it had turned so as to be headed north instead of south. Williams testified that the truck did not travel to a point on the highway close to the traffic light. Williams also testified that the defendant had not worked on the line under the highway since Saturday before the accident happened on Friday. Williams testified that there was not any dirt on the highway from the front of his station to the traffic light on the day before the accident; and that there was dirt on the highway the morning after the accident which was placed there by the truck sliding. With reference to the traffic light, Williams said it had been acting up, in that it would

jump from green to red without giving a caution signal, and that the light was worked on about a couple or three hours after the accident. On cross-examination of Williams, the evidence shows that he saw tracks in what he termed the borrow pit, which he said were made by the pickup in spinning its wheels.

Earl Shurden, Burchfield's employer, went to the scene of the accident after it occurred, arriving there at about 8:00 o'clock a.m. The pickup truck had not been removed when he arrived there.

Shurden testified that he observed dirt on the highway close to and north of the intersection, which the rain had turned into mud. He demonstrated on a schematic drawing used by counsel the location of the truck and pipe with reference to the west side of the highway and identified and explained several photographs of the scene which had been introduced in evidence.

This witness testified that the mud, "it came even with the service station. The further north it went the thinner it was, though." The Court considers the gist of this testimony to be that the material part of the accumulation of mud on the highway was located at or near the place in the highway under which the pipe was being installed. Shurden also testified that he passed the place where the accident occurred almost every day; that for several days prior to the accident there was a pile of packed dirt just north of the stoplight; that he passed there within two days of the accident; and that the place was pretty rough at the time.

Otha Shurden visited the scene of the accident, arriving there at about seven-thirty. The pickup truck had not been moved at the time. Shurden parked his truck at the south end of the Lion Service Station and walked almost directly across the road to the pickup truck. This path led him across the highway fifteen or twenty feet north of the place in the highway where the water pipe was being installed. Shurden testified that he saw quite a bit of mud and water in the highway at the place where he crossed, which he described as across from the south drive of the Lion Service Station, and stated, "the further south you went the muddier it was."

William A. Kinard, defendant's project superintendent, testified that when the subcontractor started the boring operation the lead bit of the auger twisted off and the staff broke; that it was necessary for the subcontractor to order a replacement bit and the operations were delayed about two weeks; that the boring operation was suspended on Saturday preceding the Friday on which the accident occurred—a space of five days. Kinard located on the survey which had been introduced in evidence the place on Highway 49W, north of the intersection, where the waterline was being installed. He stated that they had been working along Highway 442 from the inception of the project until the day of the accident; that no work had been done on Highway 49W and none of the equipment had travelled north on Highway 49W from the intersection to the asphalt road leading west from the highway.

Defendant testified that the twenty-inch steel casings had a three-eighths inch wall thickness, and each section, twenty feet in length, weighed sixteen hundred twenty (1620) pounds. He further testified that it was his opinion that the sideways force of the pickup truck could not have moved the pipe, as they were situated at the time of the accident.

W. P. Black, Mississippi Highway Patrolman, investigated the accident and arrived at the scene about eight forty-five. The vehicle had been moved at the time. Black made two photographs of the scene. He also took three photographs of the truck which by then had been moved to a garage at Drew.

The photographs taken by him are in evidence as Defendant's Exhibits twelve through sixteen. They are also Plaintiffs' Exhibits 22–26. An examination of Exhibit 12 shows tracks made in

grass in the shoulder of the road leading southwest to the casings in the ditch and approaching the point from the northeast. The witness testified the only physical evidence he could find were skid marks on and leaving the highway and the point of impact of the vehicle on the power pole. Defendant's Exhibit 13 is a closeup picture of the power pole. This pole appears to have white skid marks and is in line with or slightly to the right of the path of the skid marks shown on the grass in Defendant's Exhibit 12. The witness testified that he examined the west shoulder of Highway 49W, north of Highway 442, for approximately one hundred fifty yards and did not find any skid marks other than those shown in said Exhibit 12. The pictures of the truck taken by him (Defendant's Exhibits 13, 14 and 15) reflect damage to the right part of the front bumper under the headlight and the nature of the damage is such as to convince the Court that it was made by coming in contact with one of the heavy steel casings. The only part of the truck shown to have been damaged, other than the front bumper, is the left side, at the door of the cab. This damage is of such a nature that, when considered in light of the condition of the power pole, convinces the Court that this part of the truck collided with the utility pole.

Black, by the use of Defendant's Exhibit 6 (survey of the scene), located a point on the highway north of the intersection on Highway 49W from which began the skid marks observed by him in his investigation. He testified the marks on the highway proceeded forty feet down the highway before leaving the pavement and entering the west shoulder of the road. He designated on the exhibit the place where the skid marks left the pavement. The map or plat of the survey is drawn to scale, and by use of the scale the Court has determined these points to be 240 and 180 feet, respectively, from the traffic light at the intersection.

Haywood Wilson, a son-in-law of Burchfield, was called by plaintiffs as a rebuttal witness. He testified that he went to the scene of the accident before the truck was removed. He estimated this to be about 7:30 in the morning. The witness was asked to interpret a photograph introduced in evidence by plaintiffs and designated as Exhibit No. 5. He saw tracks on the photograph which lead from the highway to the pole. Plaintiffs' Exhibit 19 was shown the witness. This exhibit reflects tracks or marks along the shoulder of the highway, running northeasterly and southwesterly. He could not remember seeing the tracks while he was at the scene. It is shown in the record that this photograph was taken by one of the attorneys for the plaintiffs at about nine or nine thirty that morning. All of the photographs introduced by plaintiffs and shown in the record as Plaintiffs' Exhibits 1–21 and 27–34 were taken by this attorney at the same time. The wrecker, which the record shows to have had dual wheels, was there when the witness arrived on the scene, but he did not know how the tractor moved in to pick up the truck.

Joel C. Haynes, another son-in-law of Burchfield, testified in rebuttal. His testimony was in line with that of Wilson, except this witness saw the wrecker and said it seemed to him it was parked on the gravel road on the other side of the ditch (away from the highway).

The inconsistencies and discrepancies in the testimony of the witnesses and between the testimony of the different witnesses have been carefully weighed by the Court in an effort to arrive at the true facts surrounding the accident.

It is apparent from the record that the traffic light at the intersection of Highways 49W and 442 was not functioning properly. When the light changed suddenly from green to red without an intervening yellow caution light, Burchfield, observing this sudden change, attempted to stop the truck and applied the brakes with full force. The

application of the brakes on the wet pavement caused the truck to slide off the highway and into the pipes and utility pole.

The Court finds that defendant did not maintain signs of any nature to warn motorists of the presence of the excavations, or of the condition of the highway in and around the place where the pipe line was being installed under the highway and where his equipment utilized the drive at the service station, except burning smudge pots at the trenches; and that by the use of the drive aforesaid and the excavation on the east side of the highway, gumbo dirt, prevalent in the community where defendant was engaged in the installation of a municipal water system, was permitted to accumulate on the highway near the said excavation and entrance of said drive. The Court further finds that defendant did not undertake to remove the dirt and permitted it to remain on the highway.

The evidence in the case does not establish that the absence of signs along the highway had a causal connection with the accident, neither does it show that the condition of the highway occasioned by leaving gumbo dirt there had a causal connection therewith. The sole proximate causes of the accident were the sudden change of the light and the wet pavement as the result of rain. The evidence shows that Burchfield drove over this section of the highway twice on the day prior to the accident. The Court is of the opinion that he was familiar with the excavations and the condition of the highway at that point. It was not necessary, therefore, for signs to be posted to inform him of these matters. The Court is also of the opinion that the mud created by the gumbo dirt on the highway did not extend far enough north on the highway to be a contributing factor, either to the movement of the truck or the decision of Burchfield to apply the brakes.

CONCLUSIONS OF LAW

■■ It was the duty of defendant to exercise the care of a reasonably careful and prudent person to keep and maintain the area of the highway used by him in the prosecution of his work in a reasonably safe condition for the general use of the travelling public. 40 C. J.S. Highways § 254, page 293; Gulfport & Mississippi Coast Traction Co. v. Manuel, 1920, 123 Miss. 266, 85 So. 308; Mississippi Power Co. v. Sellers, 1931, 160 Miss. 512, 133 So. 594; Mathews v. Thompson, 1957, 231 Miss. 258, 95 So.2d 438, 450. Whether defendant, in permitting an accumulation of gumbo dirt on the highway near the excavations, created a condition dangerous to persons using the highway and interfered with the common general use of the road and was therefore negligent is a question for the trier of the facts; as is, whether such negligence, if any, was a proximate or contributing cause of the injuries to decedent. United Gas Pipe Line Company v. Jones, 1959, 236 Miss. 471, 111 So.2d 240, 252. The same rule applies with reference to the placing of the steel casing pipes on the highway right of way and the failure of defendant to erect signs on the highway giving notice of the existence of construction work.

■ Applying the rule of reasonable care, the Court finds that defendant did not exercise reasonable care to keep the area of the highway adjacent to the excavations where the pipe line was being installed under the highway in a reasonably safe condition for the general and customary use of the travelling public, and was, therefore, negligent in this regard. This negligence, however, had no causal connection with the accident and injuries of the decedent, for the reason that the truck left the paved portion of the highway and entered upon the shoulder before it reached this area. The existence of the dangerous area was not a factor in bringing about the application of the brakes of the truck.

■ Defendant had permission from the highway department to install the pipe line under the highway and for this work to be done it was necessary to assemble the steel casing pipes. These pipes were placed on the right of way in a drainage ditch twenty-four feet from the pavement. The defendant, in the exercise of reasonable care, could not foresee that a motorist, in making general use of the highway as an avenue of travel, would use this portion of the highway. A motorist is not entitled to the entire public highway from property line to property line. The standard of care is to keep the highway reasonably safe for general use. Gulfport & Mississippi Coast Traction Co. v. Manuel, supra; Mississippi Power Company v. Sellers, supra.

In Jones, supra, the pipeline company erected a concrete post at the outer edge of the highway shoulder about three or three and one-half feet from the edge of the pavement. The automobile involved in the case came in contact with the post, giving rise to the action. The Court held the questions whether the pipeline company negligently placed the post on the highway right of way in a manner to constitute a danger to persons using the highway, or to interfere with the common use of the road, and whether such negligence, if any, was a proximate cause or contributing cause of the passenger's injuries, were for the jury.

In this case, the pipes were twenty-four feet from the pavement and in a drainage ditch. The Court holds and determines the defendant was not negligent in placing the pipes on the highway right of way under the circumstances of the case.

■ Defendant placed burning smudge pots at night on the excavations. This accident occurred in the daytime, and the piles of dirt were clearly visible to the travelling public. However, the accumulation of the dirt as above-mentioned and the resulting mud when it rained could not be readily ascertained.

The Court holds that the defendant was negligent in failing to erect road signs giving notice of this condition. But, here again, there was no causal connection between the absence of such signs and Burchfield's sudden decision to apply the brakes. The changing of the traffic light from green to red, without the intervening yellow light, was the sole proximate cause of this decision. Defendant had no responsibility with reference to the light.

The changing of the light, the wet pavement occasioned by the rain, and the speed at which Burchfield was operating the truck combined one with the other to bring about the accident and his injuries.

The Court cannot find that any negligence of defendant proximately caused or contributed to the unfortunate accident.

For the reasons stated, a judgment will be entered in favor of the defendant.