# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 92-CA-00356-SCT

*MISSISSIPPI POWER & LIGHT COMPANY*

*v.*

*LESLIE LUMPKIN, INDIVIDUALLY AND AS MOTHER AND NEXT FRIEND OF KRISTEN BLACK, A MINOR*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/13/92 |
| TRIAL JUDGE: | HON. JAMES E. GRAVES |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | NATIE P. CARAWAY |
| ATTORNEY FOR APPELLEE: | WILLIAM LISTON |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | REVERSED AND REMANDED - 2/26/98 |
| MOTION FOR REHEARING FILED: | 3/19/98 |
| MANDATE ISSUED: | 8/17/98 |

**EN BANC.**

**BANKS, JUSTICE, FOR THE COURT:**

¶1. Here we consider the question whether a utility company may be liable for injuries suffered by a passenger where a negligent driver strikes one of its poles in a public right-of-way, off the traveled portion of a highway. We answer the question in the affirmative, where a properly instructed jury finds that there was negligence in the placement or maintenance of the pole and that such negligence proximately contributed to the accident and injuries sustained. We overrule our prior decision in *Vines v. Southwestern Mississippi Elec. Power Ass'n,* 241 Miss. 120, 129 So. 2d 396 (Miss. 1961) to the extent that it is inconsistent with the conclusion reached today. The judgment for the plaintiffs is reversed because we conclude that the trial court improperly excluded certain evidence. We remand for further proceedings consistent with the principles announced today.

### I.

¶2. Leslie Lumpkin filed this complaint in the Hinds County Circuit Court on February 20, 1990, on her own behalf and on behalf of Kristen Black, her daughter, against Randy Tackett and Mississippi Power and Light Company (MP&L). MP&L is a Mississippi corporation engaged in the business of the generation, manufacture, transmission, distribution and sale of electricity within the State of

Mississippi.

¶3. The complaint alleges that on November 23, 1989, at approximately 11:30 p.m., Kristen was severely injured after coming in contact with an uninsulated electrical distribution line installed by MP&L. Kristen had just exited Tackett's automobile, which had crashed into a power pole supporting the high voltage lines. The complaint states that as a direct and proximate result of the negligence of both Tackett and MP&L, Kristen was seriously and permanently injured. Tackett was charged with failing to maintain proper control over his vehicle. Lumpkin alleged that MP&L was negligent in failing to design, construct, install and maintain its power distribution poles and lines in relation to the roadway and its right-of-way so as to reasonably reduce hazard to life. Lumpkin also contended that the placement, construction, maintenance and location of the pole constituted a public nuisance.

¶4. MP&L answered on March 6, 1990, and maintained that it was not negligent, nor had it created a reasonably foreseeable hazardous condition by the placement of the utility pole involved in this case. MP&L claimed that Tackett had operated his vehicle while under the influence of intoxicating beverages, and that he was therefore negligent as a matter of law. MP&L alleged that Kristen was negligent in failing to properly watch for the downed power lines and for voluntarily riding in Tackett's automobile when she was aware that Tackett had consumed alcohol.

¶5. Trial of this case commenced on January 27, 1992. At that time, Tackett brought forth a motion *in limine* to prohibit any evidence of his consumption of alcohol on the night of the accident. The trial court granted Tackett's motion, finding that the probative value of the evidence was substantially outweighed by prejudice because prior to trial he admitted that he was negligent in the operation of his vehicle. He continued to deny that his negligence proximately caused Kristen's injuries.

¶6. The jury returned a special verdict in which it found Kristen fifty percent at fault, MP&L fifty percent at fault, Tackett not at fault, and awarded damages in the amount of $750,000.00. On February 20, 1992, MP&L filed a motion for judgment notwithstanding the verdict and alternatively for a new trial. The plaintiffs filed a motion for an additur in the event the trial court granted MP&L's motion for a new trial on the issue of the reformed jury verdict. However, Judge Graves denied MP&L's post-trial motions, and consequently did not reach the plaintiff's motion for an additur. MP&L appeals the trial court's ruling.

## II.

¶7. On the night of November 23, 1989, Tackett and several passengers were riding in Tackett's 1983 Ford Mustang. Among the passengers were Crystal and Heather Barry, Shane Acy and Kristen Black. Tackett was driving the group back to Greenwood, Mississippi, after going to Philip, Mississippi, to see where Kristen's boyfriend lived.

¶8. Tackett realized that he was beginning to take an extremely sharp curve. He recalled traveling at a speed of at least fifty-five miles per hour. According to Kristen, as Tackett neared the curve on Money Road she stated, "Randy you know, there is a bad curve up ahead." He tried to make the curve by slowing down and moving over the center line to the left. At that time Tackett's brakes locked up and Tackett lost control. The car slid off the road and severed a utility pole. He testified that he never saw the utility pole even as the car drove through it.

¶9. After the Mustang collided with the pole and came to a stop in the field, Kristen wanted to get out of the car because she did not know what condition the car was in at that time. No one had been injured in the automobile accident. She stated that she was nervous and scared as she exited the vehicle. The area was completely dark as there were no street lights, and Kristen removed her shoes because they were sticking in the mud. She did not know that a power pole had been knocked down, nor did she see the downed power lines.

¶10. The next thing she remembered was lying in the ditch by the road. She did not know what had happened, but she was cold and crying because her left arm was in severe pain. She stated that her left arm was hurting so bad that when she tried to hold her arm, she felt nothing but her sweater. Tackett said that it was so dark that he didn't see the downed electrical wire until after Kristen had been electrocuted. Tackett then pulled her out from under the wire.

¶11. Heather Barry testified that she had also started walking toward the road with Kristen, but stopped when she saw the wires hanging. She said "Kristen, don't go up there. There's wires up there." Kristen told her that she was just going to go up under them. Kristen kept walking and Heather saw her bend over. Heather then heard a buzzing noise and saw sparks and Kristen's face light up. Kristen fell over on her back. Heather did not notice any buzzing, crackling or any light coming from the wire prior to Kristen's contact with the wire.

¶12. Dr. Joe Keith Robbins was on emergency room duty at the Greenwood Leflore Hospital on Thanksgiving Day of 1989. Kristen was brought into the emergency room shortly after midnight. Kristen's injuries involved third degree burns to the left wrist. Dr. Robbins stated that her burns extended all the way into the bone and up to her shoulder. There was very little flesh remaining around the distal forearm. Kristen, emotionally distraught and in critical condition, was transferred by ambulance to the Burn Center in Greenville, Mississippi.

¶13. Dr. Robert Love first saw Kristen at the Burn Center in the early morning hours of November 24, 1989. He carried out a physical examination and determined that she had a severe burn resulting from an electrical injury. Her injuries were very severe to her left upper extremity, and she was also severely burned in the buttocks and the sacral or lower back area. With regard to the injury to Kristen's left arm, there was no remaining muscle tissue or blood vessels. He determined that her arm was non-viable and that amputation was necessary.

¶14. From the time of her admission to the time of her discharge, Kristen spent one month and two days at the Burn Center. Kristen underwent four operations while she was in the Burn Center. The first was to amputate the left arm and a portion of the shoulder and a portion of the chest. Kristen's second operation on November 28, 1989 consisted of a skin graft to treat the burn to the buttock area. The third surgical procedure involved the removal of more dead muscle and a repeat of the skin graft from the second operation. In her fourth and final operation on December 19, 1989, a screw was inserted into the remaining portion of the bone in her upper left arm.

¶15. Mrs. Lumpkin stated that the majority of Kristen's post-amputation pain was in the form of phantom pain, which occurred almost every day. Phantom pain is a condition where a patient, after amputation of an extremity, still feels pain in the extremity. In Kristen's case, Dr. Love said that she might continue to feel pain in her left hand even though it has been amputated. Kristen said she still felt that pain as of the time of trial.

¶16. Kristen was fitted with an artificial limb at the Methodist Rehabilitation Center. The bill for Dr. Love's services in treating Kristen amounted to $6,245.00. The bills from the Delta Medical Center totaled $54,732.90. Miscellaneous charges from the hospital pharmacy and supply totaled $5,341.69. Mrs. Lumpkin testified that the total amount of medical bills incurred on behalf of Kristen up to the time of trial totaled $87,007.08. Mrs. Lumpkin had also incurred out-of-pocket expenses in the amount of $2,991.00

¶17. Mrs. Lumpkin did not think Kristen "cared too much about life" after the accident. She said Kristen made statements like "life is really no fun" or "life is really not worth living" or "nobody really cares anyway" or, "what's the point?" During treatment of Kristen, Dr. Love consulted with Dr. Gil McVaugh, a clinical psychologist, in regard to what Dr. Love believed to be a potential mental disorder in Kristen. She was generally depressed. Upon being discharged from the Burn Center, Kristen returned every other day on an outpatient basis. Kristen improved physically, but Dr. Love thought that she deteriorated mentally.

¶18. Dr. Michael Whelan, a practicing psychologist, saw Kristen at the emergency room on January 15, 1990, after she was found by the police because she tried to run away from home. Dr. Whelan's diagnosis was that Kristen was suffering from an adjustment disorder or perhaps major depression. Dr. Whelan began seeing Kristen on a regular basis after this incident. He learned that prior to sustaining the injury involved in this case, she had been diagnosed with oppositional defiance disorder. She was apparently more rebellious and more argumentive than the average teenager. In Dr. Whelan's opinion, the loss of her arm would exacerbate all of her preexisting problems such as her difficulty in expressing emotions. His diagnosis was that she had a permanent personality disorder involving emotional scars so deep that they were going to interfere significantly with the rest of her life. He was of the opinion that her various psychological problems with regard to the diagnosis and her prognosis were directly related to the injury she sustained on November 23, 1989.

¶19. Mr. Harold G. Fortenberry, a vocational rehabilitation consultant, testified that Kristen suffered a twenty to fifty-five percent loss of wage-earning capacity as a result of the accident.

¶20. Deputy Gibson of the Tallahatchie County Sheriff's Department investigated the scene around midnight on November 23, 1989. The power pole had been broken in three pieces. At its lowest point, the power line was three or four feet off the ground. He noticed there were no street lights or any other roadway lighting in the area where Kristen was injured. Deputy Gibson measured eighty feet of skid marks leading to the edge of the road. He agreed that Tackett's automobile must have been airborne when it struck the pole. The car came to a halt about thirty yards out into the field. Because it was muddy, the car stopped shorter than it would have had it been dry. There were no signs warning drivers to slow down as they approached the curve.

¶21. Mr. William Vaughn, an MP&L senior lineman, helped build the Money Road power line. It was a distribution line carrying eight thousand volts of electricity. The pole that Tackett's automobile struck supported only two wires, one carrying electricity and one ground wire. Vaughn stated that it was company policy to recognize and report hazardous conditions involving power lines. He was familiar with the curve on Money Road where the accident occurred because he noticed skid marks in the curve even before the pole was installed. A pole in the same location as the one Tackett collided with was struck and broken when a vehicle missed the curve in Money Road and hit the guy wire in

1984.

¶22. Vaughn stated that all the supervisors, the people in the district office, and the crews working on Money Road knew that cars regularly ran off that portion of Money Road. The original engineering plans for the Money Road line did not provide for placement of a power pole where the power pole was ultimately positioned. The line crew was unable to comply with the plans drawn by the engineer because of an obstruction, namely an ammonia tank, and also the fact that the guy wire would have extended into a farmer's cotton field.

¶23. Bob Marsh stated that MP&L never tried to predict, in determining the location of its utility poles, where an out of control car would run off the road. He admitted that after the similarly located utility pole was struck in 1984, MP&L knew that cars could come in contact with the pole. Marsh indicated that MP&L did not attempt to relocate the pole for the same reasons that the utility pole was positioned there in the first place, namely, because the pole would have interfered with an ammonia tank and a cotton field.

¶24. Marcus Williams, an expert in the field of highway construction and engineering, opined that the utility pole was unreasonably dangerous because of its location. The curve in question was basically a flat curve that angled somewhere between sixty and ninety degrees. He said that the curve was so sharp that people should have been expected to fail to negotiate the curve. He said the pole was within a one-hundred-foot danger zone where a car would travel if it failed to make the curve. Williams further stated that following the original plans would have been a solution to this problem. Williams also stated that the placement of this pole, including its high-powered electric charge, was extremely dangerous and constituted a public nuisance to the traveling public.

¶25. Yerby Hughes, an electrical engineer with four years' experience in the design and construction of the type of power line involved in this case, stated that the applicable safety code for this type of construction and maintenance was the National Electrical Safety Code (NESC). Hughes pointed out § 211 of the NESC, which stated that "all electric supply and communication lines and equipment shall be installed and maintained so as to reduce hazards to life as far as is practical." He believed that MP&L's placement of the pole in question was a violation of that code section.

¶26. Walter Neel, an expert in the fields of civil and traffic engineering, stated that based upon a reasonable professional probability, the Money Road power pole involved in this case constituted a foreseeable risk of harm to the public. Although there was a warning sign located about 390 feet from the center of the curve, Neel said that it falsely indicated that the curve was gentle. Neel determined that a safe speed for maneuvering the curve would be approximately twenty-five miles per hour.

### III.

¶27. MP&L first asserts that the trial court erred in failing to grant its motion to dismiss, its motion for summary judgment, its motion for directed verdict, its motion for peremptory instruction, and its motion for judgment notwithstanding the verdict. It also argues that the trial court erred in granting Jury Instruction P-4, and in failing to grant Jury Instructions MD-15 and MD-12. Under this assignment of error we are asked to determine whether, under any circumstances, a utility company may be held liable for injuries sustained when an admittedly negligent driver collides with a pole

constructed for the purpose of distributing electricity, when the pole is located within the public right-of-way off the main-traveled portion of a road.

¶28. MP&L argues that *Vines v. Southwestern Mississippi Elec. Power Ass'n,* 241 Miss. 120, 129 So. 2d 396 (1961) answers the question as follows: if someone goes off the main-traveled portion of the road, thus taking the driver out of the category of drivers making *ordinary* or *common* use of the road, the utility company is not subject to liability. MP&L maintains that electric utilities are not required to place their poles in order to insure the safety of reckless drivers. According to MP&L, the reason it only has a duty of reasonable foreseeability *to those making a proper use of the road* is because predicting where reckless drivers such as Tackett will leave a roadway is always unforeseeable. In other words, MP&L suggests that it should not be charged with the responsibility of protecting against negligent drivers who collide with a pole that is located within the public right-of-way but off the main-traveled portion of the road.

¶29. On the other hand, Lumpkin argues that if MP&L knew or should have known of the danger of the placement of this particular utility pole within the public right-of-way (as evidenced by the number of off-road occurrences in this location including one in which the guy wire of this pole was actually hit and the pole knocked down), MP&L at least had a duty to eliminate the danger to the extent practical.

¶30. Miss. Code Ann. § 11-27-43, in pertinent part, states:

> All companies or associations of persons incorporated or organized for the [purpose of distributing and selling electricity] are authorized and empowered to erect, place and maintain their posts, wires and conductors along and across any of the public highways, streets or waters and along and across all turnpikes, railroads and canals, and also through any of the public lands. . . *provided in all cases such authorization shall meet the requirements of the National Electrical Safety Code. The same shall be so constructed and placed as not to be dangerous to persons or property; nor interfere with the common use of such roads, streets, or waters; nor with the use of the wires of other wire-using companies; or more than is necessary with the convenience of any landowner.*

Miss. Code Ann. § 11-27-43 (1972) (emphasis added). This statute has remained in effect and unchanged since January 1, 1972. The pole in question in this case was erected in 1980. Thus, MP&L was then and is now authorized to erect power poles for the purposes of selling and distributing electricity, so long as (1) the NESC requirements are met; (2) there is no resulting danger to persons or property; (3) there is no interference with the common use of roads, streets and water; (4) there is no interference with the use of wires by other wire-using companies; and, (5) the construction does not unnecessarily inconvenience any landowner. Stated differently, the portion of the statute highlighted above expresses several distinct requirements, each denoting a separate mandate. MP&L's argument, relying solely on the third requirement (*common* use of roads), is therefore too restrictive.

¶31. Section 20, ¶ 211 of the 1961 edition of the NESC provides:

> All electric supply and communication lines and equipment shall be installed and maintained so as to reduce hazards to life as far as practical.

It follows that MP&L has a duty to protect against hazards of which it has or should have knowledge. This section of the NESC certainly does not limit MP&L's duty to protect against and reduce only those hazards occurring on the main-traveled portion of the roadways.

¶32. We have recognized that the violation of the minimum standards established by the NESC constitutes negligence per se. *See* **Gifford v. Four-County Elec. Power Ass'n**, 615 So. 2d 1166, 1173 (Miss. 1992) (failure to grant jury instruction that violation of NESC standards constitutes negligence per se is reversible if evidence shows violation occurred). Moreover, the second requirement of § 11-27-43, that power poles must be constructed in such a way so as to avoid endangering people or property, says nothing about a utility company being immune from liability when an accident occurs upon a public right-of-way off the main-traveled portion of the road.

¶33. MP&L argues that the facts in *Vines* are compellingly similar to the facts in the present case. For all practical purposes that is so. We need not engage in any extensive fact comparison. This matter must be resolved by determining whether the *Vines* formulation remains the law of this state.

¶34. The statute extant and quoted by the *Vines* Court, § 2778 of the Mississippi Code of 1942, as amended and recompiled, read as follows:

> All companies or associations of persons incorporated or organized for such purposes are authorized and empowered to erect, place and maintain their posts, wires and conductors along and across any of the public highways, streets, or waters and along and across all turnpikes, railroads and canals, and also through any of the public lands; but the same shall be so constructed and placed as not to be dangerous to persons or property; nor interfere with the *common use* of such roads, streets, or waters; nor with the use of the wires of other wire-using companies; or more than is necessary with the convenience of any landowner.

*Vines,* 241 Miss. 120, 125, 129 So.2d 396, 397 (quoting § 2778, Mississippi Code of 1942) (emphasis supplied by the *Vines* Court). One legal distinction in these two cases is that the predecessor statute relied on by the Court in *Vines*, in setting forth the requirements of power pole/line construction, made no reference to the NESC; while, as pointed out above, the present statute, Miss. Code Ann. § 11-27-43, which the trial court relied on in this case, fully incorporates the requirements of the NESC. Otherwise, the statutes are essentially identical.

¶35. Lumpkin asks us to find that *Vines* has been overruled *sub silentio*, citing **Spears v. Mississippi Power & Light Co.,** 562 So. 2d 107 (1990). MP&L states that Lumpkin's argument must fail because the *Spears* opinion does not address § 11-27-43, and because *Spears* did not involve the location of a power pole along a public right-of-way. It argues that, unlike Tackett, the *Spears* driver was driving in an area where he unquestionably had a right to be, not off on some untraveled area.

¶36. The issue in *Spears* was framed as follows:

> [What is the] standard of care owed by an electric power company to an invitee of the business property parking lot owner where the power company has an easement and right-of-way across the parking lot, and the invitee of the property owner is injured on a rainy night when he collided with a dark, unmarked power pole owned by the power company and which occupies a portion of the premises where traffic normally flowed[?]

***Id.*** at 108. We answered:

> [c]ertainly, when we exercise our right to utilize our property, we have the duty to avoid creating an unreasonable risk of harm to another. Restatement (Second) of Torts § 297 (1965). Reasonable care is the care a reasonable person would exercise under like circumstances. Id. § 283. Measured by this standard, it would be a question for the jury to determine whether or not the power company met this standard. *Whether or not the pole was properly located, lighted or otherwise marked; and whether or not a reasonable person would anticipate contact between the light pole and moving vehicles are jury questions*. Was the injury to the plaintiff or to someone using the lot to park a vehicle, foreseeable or one which the defendant would be obliged to anticipate? Was the pole adequately marked? Should it have been surrounded by guard rails or some other device to prevent its being struck with the risk that the transformer located on it might injure persons or property in its fall? We think these and other questions presented material issues of fact which should have been presented to the jury. What we say here is consistent with the case law of other jurisdictions which have discussed similar issues. ***Georgia Power Co. v. Collum,*** 176 Ga. App. 61 334 S.E.2d 922 (1985) (power company charged with duty of ordinary care in construction and maintenance of wires, poles, transformer, and equipment). ***Hellman v. Julius Kolesar, Inc.***, 399 N.W.2d 654 (Minn. App. 1987) (applied common law test of duty which involves probability or foreseeability of injury to plaintiff). ***Scheel v. Tremblay***, 226 Pa.Super. 45, 312 A.2d 45 (1973) (in locating pole the utility is charged with the duty to locate so as to avoid unreasonable and unnecessary dangers to travelers upon the highway). ***Davis v. Chrysler Corp.,*** 151 Mich. App. 463, 391 N.W.2d 376 (1986) (issue of breach of duty to properly maintain pole is question for jury). ***Bourget v. Public Service Co.,*** 98 N.H. 237, 97 A.2d 383 (1953) (question of improper placement and maintenance of utility pole is for jury). ***Vigreaux v. La. Dept. of Transp. & Devel.***, 535 So. 2d 518 (La.App.1988) (jury question as to whether utility's placement of pole adjacent to road constituted unreasonable risk of harm to users of road).

***Spears***, 562 So. 2d at 108 (emphasis added).

¶37. ***Spears***' effect on the vitality of ***Vines*** is problematic. ***Vines*** dealt with our statute permitting the use of utility poles in public right-of-way and, unlike in ***Spears***, a driver who was not in the traveled portion of that right of way. However, as previously noted, § 11-27-43 clearly mandates that a utility company must not erect its power poles in such a manner as to endanger people or property. We find that this is synonymous with the language in ***Spears*** to the effect that a utility company must avoid creating an unreasonable risk of harm to others. Further, § 11-27-43, as enacted after the decision in ***Vines***, states that power poles must be erected in accordance with the provisions of the NESC, which states that utility poles "shall be installed and maintained so as to reduce hazards to life as far as practical." We hold that this places on a utility company the continuing duty to eliminate foreseeable danger. Although the ***Spears*** case is factually distinguishable from the present case, the reasoning behind placing these questions before a jury is equally applicable.

¶38. Whatever may be said for the proposition that ***Vines*** was overruled *sub silentio* by ***Spears***, we conclude that insofar as it stands for the proposition that a utility company owes no duty to persons who may, through foreseeable negligence, come in contact with its poles, ***Vines*** must be overruled. The duty of the utility company is to exercise reasonable care. That duty is not obviated by the failure

of the injured party or another to exercise such care unless it is determined by the factfinder that the latter's conduct was the sole proximate cause of the injury. *Vines*' holding, if taken to mean that the utility company is liable only to non-negligent drivers, is not in keeping with proper construction of the statutory authority exercised by the utility or our law of comparative negligence. It is also at variance with decisions involving other users of public rights-of-way, as shall be shown below.

¶39. As a matter of statutory construction, MP&L erroneously interprets the prohibition in § 11-27-43 against interfering with "the common use" of the right-of-way as a restriction upon the command that its use of the right-of-way be "not in a manner to be dangerous to persons or property." MP&L contends that its duty to guard against danger to others is restricted to non-negligent others. Even a casual reading of the statute indicates that the term "common use" does not refer to "proper" use or even "ordinary" use but to use in general, that is, concomitant use by the public. Black's Law Dictionary 345 (4th ed. 1968). Even if the term "ordinary" is deemed incorporated into the "common use" provision it does not follow that ordinary negligence of a type reasonably to be contemplated is such "uncommon use" as to avoid the positive command of the statute to erect poles "not in a manner to be dangerous to persons." There is nothing in this statute which permits a construction that those erecting poles may be oblivious to incidents of ordinary negligence.

¶40. While the *Vines* opinion placed emphasis on the term "common use" when quoting the statutes in question, there is no other indication that the court there construed "common" to mean "proper" as a matter of statutory interpretation. What the court did rely upon were previous decisions, one of which predated the statute, announcing a public policy concern in the application of tort law principles in these circumstances. *Vines,* 241 Miss. at 127, 129 So. 2d at 398. MP&L continues to press those same concerns here.

¶41. Succinctly stated, that public policy concern is that it is of immense benefit to the public generally that public utilities be allowed to use public rights-of-way for the delivery of the benefits of those utilities. It follows, the argument goes, that a different standard for negligence or that a specific standard of care for conformity with the general standard of care applies. *See* ***Coweta County v. Adams***, 473 S. E. 2d 558, 562 (Ga. Ct. App. 1996) (Smith, J., dissenting from majority holding applying an ordinary standard of care and urging a different standard for utilities based on public policy); ***McMillan v. Michigan State Highway Comm'n***, 393 N.W. 2d 332, 342-344 (Mich. 1986) (Riley, J., dissenting from Michigan Supreme Court holding overruling its previous holdings precluding liability to passengers in vehicles which leave the traveled portion of the road. Justice Riley would have continued to adhere to the prior cases as expressive of "overriding considerations of public policy" which militate "in favor of uniformity concerning the specific standard of conduct to which a utility company must conform for purposes of the common law of negligence, with respect to the placement of utility poles in or near public highways.")

¶42. In ***Gulfport & Mississippi Coast Traction Co. v. Manuel***, 123 Miss. 266, 278, 85 So. 308, 309 (1920), which was quoted and relied upon in *Vines,* this Court alluded to the public policy of allowing public uses of right-of-way other than travel. The legislature, our premier expositor of public policy, later expressed itself by the statutes allowing both electrical and natural gas utilities use of public rights of way. *See* *Vines*, 241 Miss. at 125-126, 129 So. 2d at 397-98. It is those statutes which we now construe.

¶43. There is no compelling reason why the statutes providing for the use by natural gas companies should be given a different construction than those governing electric utility use. As for natural gas utilities, this Court has expressly held that a utility is "not relieved of liability for resulting injuries because the obstruction is outside the traveled way." *United Gas Corp. v. Parker*, 252 Miss. 486, 492, 174 So. 2d 370, 372 (1965). Neither is a utility relieved of liability because the driver of the vehicle colliding with the offending structure may have been negligent. *United Gas Pipe Line Co. v. Jones*, 236 Miss. 471, 499-500, 111 So. 2d 240, 250-51 (1959). The *Jones* Court distinguished the cases relied upon in *Vines* and the *Parker* Court distinguished those cases and *Vines* with the observation that they involved poles "'which could readily be seen from a distance by motorists approaching from either direction along the highway.'" *Parker,* 252 Miss. at 493-494, 174 So. 2d at 373 (quoting *Jones,* 236 Miss. at 499, 111 So. 2d at 251). This ground for distinguishing those cases appears to be an application of the "open and obvious" bar to recovery. If so, it must give way to our present jurisprudence incorporating that defense into our comparative fault doctrine. *See Tharp v. Bunge Corp.,* 641 So. 2d 20 (Miss. 1994).

¶44. Today we adopt a standard which requires those who place structures in rights-of-way pursuant to the statute to exercise reasonable care under the circumstances for the safety of those making common use of the right-of-way. It shall not be a bar to liability that contact with the structure occurs only after the driver, through misfortune or ordinary negligence, has left the main traveled portion of the right of way. In determining whether the placement of a pole may be considered unreasonably dangerous such that liability may follow, the trial court should consider such factors as the structure's proximity to the roadway, the configuration of the roadway, whether the utility had notice of previous accidents of sufficient similarity to give reasonable notice of the danger, and whether there are feasible alternative locations for the structure which are less dangerous. *See McMillan,* 393 N. W.2d at 339; *Scheel v. Tremblay,* 312 A.2d 45, 46 (Pa. Super. Ct. 1973).

¶45. Applying this standard to the case at bar, the conflicting evidence presented in this case created issues to be resolved by the jury: whether this danger was foreseeable given the location of the pole, the curvature and condition of the road, and the prior accident; whether Tackett's negligence was the sole proximate cause of Kristen's injuries; and whether it was practical for the utility company to eliminate the risk of harm by placing the pole in a different location. Taking the evidence in a light most favorable to the non-movant, MP&L's motion for judgment notwithstanding the verdict was properly denied by the trial court. For the same reasons, Jury Instruction P-4 was properly granted and Jury Instructions MD-15 and MD-12 were properly denied.

## IV.

¶46. MP&L claims that no jury issue under general principles of nuisance law was made in this case, and therefore the trial court erred when it granted Jury Instruction P-6. That instruction states in pertinent part:

> If you find from a preponderance of the evidence in this case that:
>
> 1. Mississippi Power and Light Company failed to construct and maintain its poles and lines involved in this case in a manner so as to reduce hazards to life as far as practicable; and
>
> 2. Its said poles and lines endangered the safety of travelers using Money Road

then I instruct you that Mississippi Power and Light Company's construction and maintenance of its poles and lines within the right-of-way of Money Road at the location where the occurrence in this case took place constituted a public nuisance. . . .

MP&L essentially reiterates its arguments under the first assignment, claiming the above jury instruction should not have been granted.

¶47. The following language was quoted with approval in *McKay v. Boyd Const. Co., Inc.*, 571 So. 2d 916 (Miss. 1990):

> There is a general agreement upon the proposition that any permanent, fixed, or stationary object or impediment, as distinguished from a mere temporary obstruction incidental to a lawful use of the way, which unreasonably and unnecessarily interferes with public travel, or which endangers the safety of travelers, constitutes a public nuisance per se. . . . It follows from the foregoing statements that an obstruction may be a nuisance although it occupies only a part of the way and sufficient space still remains to accommodate public travel, or although it is outside the traveled or worked part of the way, or even though it is in fact a thing of public convenience or benefit.
>
> *A necessary corollary of the foregoing statement of general rules is that an obstruction made in the proper exercise of a proprietary right or pursuant to due public authorization, and maintained in a proper condition, is not regarded as a nuisance. However, one invoking the protection of such authorization must show that he acted strictly within the authority conferred, and where an authorization to obstruct the public way is exercised in an improper manner, the obstruction becomes a nuisance of a kind which arises out of negligence.*

*McKay,* 571 So. 2d at 921-22 (quoting 39 Am. Jur. 2d *Highway, Streets and Bridges* § 274 (1968) (emphasis added).

¶48. Because there was evidence adduced which could have been found by the jury to prove that MP&L failed to properly exercise its right to construct the power pole in question and maintain the power pole in a proper condition, pursuant to the authority of the NESC and Miss. Code Ann. § 11-27-43, the jury could have concluded that the power pole constituted a public nuisance arising out of negligence, thereby rendering MP&L liable for damages. Therefore, the trial court did not err in granting Jury Instruction P-6.

## V.

¶49. MP&L next contends that the circuit court erred in excluding evidence of drinking by the driver involved in the accident and in failing to grant MP&L's alternative motion for a new trial. This assignment calls into question the trial court's determination to grant Lumpkin's motion *in limine* to exclude any mention of Tackett's consumption of alcohol prior to the accident. Tackett admitted to drinking four or five beers on the night of November 23, 1989, from approximately 8:30 or 9:00 p.m., until approximately 10:30 p.m., and to being "tight" prior to the wreck. He stated, however, that he did not think his ability to drive had been impaired. Tackett also conceded that he was negligent in driving over the speed limit and failing to negotiate the curve, but maintained that his negligence was not the proximate cause of the injuries sustained by Kristen.

¶50. The court ruled that the issue of Tackett's negligence, having been admitted in his brief in opposition to MP&L's summary judgment motion, was no longer before the court and that any mention of his consumption of alcohol would be unduly prejudicial. The court also had difficulty finding relevance in Tackett's admission that he was "tight" when the accident occurred, stating, "I guess I'm having problems knowing what tight means." The court determined that the word "tight" was very nebulous. Defense counsel agreed that "tight" was a nebulous word, but that since Tackett selected the word in a deposition to describe his condition, MP&L argued that it was entitled to explore it to the extent the experts thought it would be relevant to the occurrence of this type of accident.

¶51. Tackett, in his deposition, was asked whether or not he was tight, to which he replied, "I would say tight; wasn't drunk." Tackett further stated that he "knew what he was doing," but admitted that the alcohol affected him "[a] little." The court stated the following reasons for granting Lumpkin's motion:

> The Court is persuaded that the information relative to consumption of alcohol would be highly prejudicial and its relevance, inasmuch as the Defendant, Mississippi Power & Light Company contends that whether or not drivers of vehicles in this curve had been drinking, that vehicles leave the road in various directions in that curve, so that the Court is persuaded that the defense of MP&L is preserved although any mention of Defendant Tackett's consumption of alcohol is hereby excluded. The Court is persuaded that the defense of MP&L remains available to them without the admission of evidence which would clearly be highly prejudicial. So for those reasons the motion to exclude testimony in that regard is granted.

Although the foregoing statement from the trial judge, taken by itself, is somewhat confusing, an examination of earlier comments by the judge clarifies that the court was not persuaded that the evidence of Tackett's consumption of alcohol was significantly relevant to the issues or MP&L's case. The court had earlier commented: "[w]hat I hear [defense counsel] telling me is that people run all over the place whether or not they've been drinking, which seems to me to undercut your argument that this variable is so essential to your position--what you're telling me is it doesn't matter. They were all over the place, drinking or not." When the court's comments on this issue are taken as a whole, it is clear that the ruling was based on the conclusion that the relevance of the evidence of Tackett's drinking, if any, was substantially outweighed by the prejudice that would result from such evidence.

¶52. MP&L also argues that the jury was entitled to hear evidence that Tackett had been drinking because it was clearly relevant to a determination of the degree of Tackett's negligence, that is, whether he was the sole proximate cause or a contributing proximate cause, and what apportionment of fault his negligence deserves. It also asserts that this evidence was necessary to allow the jury to determine the degree of Kristen's negligence, if any, in riding with Tackett under circumstances from which the jury could infer that she was aware of his intoxication. We agree.

¶53. While we applaud the care taken by the court to preclude issues which are more prejudicial than probative, that care was misapplied in this case. We so conclude primarily because any negligence on the part of Kristen in choosing to ride with Tackett while he was driving under the influence of alcohol must be assessed by the jury. Additionally, because the foreseeability of an accident such as

this bears upon the issue of MP&L's negligence, if any, Tackett's condition may be instructive with regard to a jury assessment of the condition of the road in that location and the role that it played in the accident. While it is clear that foreseeability is to be determined by reference to what might probably happen rather than what did in fact happen, what actually happened cannot be erased from the mind of the jury in making that assessment. It is important that it know a circumstance as relevant as this. Finally, Tackett's state of sobriety may also have an impact upon the jury's assessment of his credibility in relating the events which occurred that night.

¶54. Of course, whether or not evidence is admissible for other purposes, the trial court is required to balance the potential for prejudice against the probative value of the evidence under Rule 403. *See, e.g., Watts v. State*, 635 So. 2d 1364, 1368 (Miss. 1994) ("[t]o be sure, evidence admissible under Rule 404(b) is also subject to the prejudice test of Rule 403") (quoting *Jenkins v. State,* 507 So. 2d 89, 93 (Miss. 1987)); *Ellis v. State,* 661 So. 2d 177, 184 (Miss. 1995) (trial judge ruled that defendant's testimony would not come under Rule 404(b), but properly proceeded to conduct a Rule 403 balancing test).

¶55. It is important for the courts to remember, however, that potential prejudice is not equally weighted with probative value under this test. In *Foster v. State*, 508 So. 2d 1111 (Miss. 1987), this Court held:

> [A] trial court presented with a Rule 403 objection to relevant evidence must engage in a balancing process. The more probative the evidence is, the less likely it is that a 403 factor will be of sufficient consequence to *substantially* outweigh the probative value. . . .
>
> If one or more of the 403 considerations slightly outweigh probative value, the evidence still must be admitted. To tip the scale is not enough. The 403 factors must, in the language of the rule, "*substantially* outweigh" probative value before the evidence may be excluded.

*Foster*, 508 So. 2d at 1117 (emphasis in original). We note that where the trial court makes specific findings on the record concerning its determinations under Rule 403, proper review is facilitated. *See, e.g., Ellis*, 661 So. 2d at 184.

¶56. In the present case, the trial court conducted no on-the-record balancing. We nevertheless conclude that it was error to exclude evidence of Tackett's drinking. This is a close case as to the issue of liability. The error, especially when combined with the error in excluding expert testimony to be discussed below, mandates reversal.

## VI.

¶57. MP&L next contends that the circuit court erred in excluding testimony by its expert witness, Bob Marsh, on issues of foreseeability, the variables involved in utility pole placement, and placement of the pole at the location recommended by the plaintiff's experts.

¶58. MP&L tendered, and the trial court accepted, Bob Marsh as an expert in the field of electrical engineering. Marsh generally testified that the power line in question, in his opinion, met the requirements of the NESC. However, when MP&L asked Marsh the following question, Lumpkin's counsel objected:

Q. Do you have an opinion as to whether or not prior to November 23rd, 1989, it was reasonably--from an engineering standpoint, it was reasonably foreseeable that an out-of-control vehicle would strike this pole?

MR. LISTON: We object, Your Honor. That's not one of the opinions that this witness was said to have in the discovery.

The court sustained Lumpkin's objection and MP&L made its proffer. During the proffer, MP&L attempted to make a record of what transpired at Marsh's deposition in order to show that Lumpkin's counsel was aware he would testify regarding the foreseeability issue. Lumpkin's counsel argued the following:

For the record, his anticipation is correct. I object and I would in the proffer like to state this into the record. The deposition that Mr. Caraway is now trying to get in to satisfy discovery was taken on November the 12th, 1990. I don't have the exact date, but in 1992, was when they [MP&L] said that Mr. Bob Marsh would be designated as a Rule 26-B-4-A expert which, of course, is subsequent to the time this deposition was taken. And that answer does not include any opinions on foreseeability or whether the pole should have been located in another position.

With regard to what transpired at Marsh's deposition, counsel for Lumpkin stated: "[m]ay it please the court, we'll admit that I questioned him. I asked him every question I could think of, but it's not relevant to this and I object to it." MP&L argues that Marsh was deposed and asked questions concerning the foreseeability of this accident; therefore, even though the answer to the interrogatory was never supplemented to state that Marsh would testify on the foreseeability issue, the trial court committed reversible error in excluding Marsh's testimony on this subject.

¶59. Pursuant to Miss. R. Civ. P. 33, the plaintiffs propounded a set of interrogatories to MP&L. Included was an interrogatory seeking discovery of the information permitted under Miss. R. Civ. P. 26(b)(4)(A)(i). In regard to Marsh, MP&L responded in writing on September 14, 1990, as follows:

(c) These witnesses are expected to testify that in their opinion the pole and line in question was constructed and maintained in accordance with the National Electric Safety Code and generally accepted industry standards.

(d) Their opinion is based on their education, experience, knowledge of and examination of the line in question.

¶60. We observed in *McCollum v. Franklin*, 608 So. 2d 692 (Miss. 1992) that excluding evidence for a transgression in discovery is an extreme measure. Before imposing such a sanction a trial court should consider the explanation for the transgression, the importance of the testimony, the need for time to prepare to meet the testimony and the possibility of a continuance. *Murphy v. Magnolia Elec. Power Ass'n*, 639 F. 2d 232, 235 (5th Cir. 1981). The first consideration involves a determination whether the failure was deliberate, seriously negligent or an excusable oversight. The second consideration involves an assessment of harm to the proponent of the testimony. The third and fourth considerations involve an assessment of the prejudice to the opponent of the evidence, the possibility of alternatives to cure that harm and the effect on the orderly proceedings of the court.

¶61. Clearly there is no deliberate failure to grant discovery here. Marsh was named as an expert. He was offered by MP&L to respond to the issue whether the accident was reasonably foreseeable as a Rule 30(b)(6) witness and deposed as such. Answers to interrogatories indicated that he would state an opinion that the placement of the pole complied with NESC standards. That testimony necessarily includes an assessment as to the foreseeability of accidents such as this. Foreseeability was clearly the main issue in the case about which Lumpkin was prepared to and did offer expert testimony. There was no time needed for further preparation. Lumpkin does not even claim actual surprise or prejudice if this testimony was admitted. Under these circumstances it is a clear abuse of discretion to exclude the testimony. This error requires reversal.

## VII.

¶62. We need not discuss the balance of the issues raised by MP&L because they are not likely to recur. It should suffice to say that we are troubled by the trial court's need to reform an ambiguous verdict and the manner of that reform. This situation should be corrected by the use of a less ambiguous special instruction form.

¶63. For the foregoing reasons this case is reversed and the matter remanded to the circuit court for further proceedings consistent with this opinion.

¶64. **REVERSED AND REMANDED.**

**SULLIVAN AND PITTMAN, P.JJ., CONCUR. McRAE, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. SMITH, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY PRATHER, C.J., AND ROBERTS, J. MILLS AND WALLER, JJ., NOT PARTICIPATING.**

### McRAE, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:

¶65. I agree with the majority's decision to overturn *Vines v. Southwestern Mississippi Elec. Power Ass'n*, 241 Miss. 120, 129 So. 2d 396 (Miss. 1961). The shoulders of a highway are for the use of traffic in cases of emergency, and when circumstances indicate their usefulness, they should be kept free of unnecessary obstructions, like utility poles, which are likely to cause injury to persons using the highway. However, I disagree with the majority's decision to remand this case based on the exclusion of evidence. This case was about whether there was joint liability or a single tortfeasor. The operative question for the jury was whether MP & L was negligent, regardless of the percentage, and the jury answered in the affirmative. Kristen Black was a passenger and was not negligent at all. Accordingly, I would affirm the verdict.

¶66. Evidence presented at trial established that whether drivers of vehicles in the particular curve on Money Road had been drinking, vehicles have left and will continue to leave that road in various directions at the curve. The evidence of the prior accidents at this location in the years leading up to

this incident sufficiently established that MP & L had constructive knowledge of the defective condition and that MP & L had an obligation to discover the defect and re-position the pole to protect the public from harm. MP & L's failure to take any of these measures constitutes fault which contributed to this accident. I agree with the trial judge's conclusion that the location of the electricity pole in the curve at Money Road created an unreasonable risk of harm. Both *Spears v. Mississippi Power & Light Co., Inc.,* 562 So. 2d 107 (Miss. 1990) and Miss. Code Ann. § 11-27-43 mandate that a utility company must not erect a pole if such an act will be dangerous to persons or property. As a matter of law, then, MP & L was negligent.

¶67. The question in this appeal is not the negligence of Tackett; it is whether or not the power company was negligent in placing the pole at a place where danger was foreseeable. MP & L's responsibility for the judgment returned by the jury regarding this act is not diminished, whether the driver of the car was intoxicated and hit the pole, whether the driver carelessly ran off the road and hit the pole, or whether conditions at the curve caused the driver to hit the pole. MP & L placed that pole right in the crest of a dangerous curve, knowing of the dangers that could occur there and after having second and third "bites at the apple." Further, MP & L was aware of incidents prior to the instant accident in which that pole had been hit. Nonetheless, MP & L did nothing to alleviate the clearly foreseeable risk of danger.

¶68. Whether MP & L was 1% negligent or 99% negligent, it owed the appellees the entire amount of the jury verdict, pursuant to Mississippi's joint and several liability scheme as it existed at the time. With joint and severable liability, a jury is not asked to apportion the negligence or the award between two defendants. A plaintiff can collect an entire award from either defendant or part of the award from both defendants. In this case, the jury clearly found MP & L to be negligent. The alleged influence of Tackett's drinking would not change the fact that MP & L negligently placed the pole in a dangerous position and continued to maintain it there after being put on notice of the dangerous situation. In the instant case, Lumpkin and Black may enforce their judgments in full against MP & L as a solitary obligor. If it feels compelled to do so, MP & L may then assert its own rights of contribution and/or indemnity against Tackett.

¶69. Accordingly, the jury verdict should be affirmed.

**SMITH, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART***:*

¶70. I agree with the majority that the trial court erred by failing to admit evidence of Tackett's intoxication and in failing to admit the testimony of Mississippi Power and Light's expert, Marsh. I accordingly agree that this case must be reversed. However, I strongly disagree with the majority's attempt at overruling of *Vines v. Southwestern Miss. Elec. Power Ass'n*, 241 Miss. 120, 129 So. 2d 396 (1961), as well as other issues raised by Mississippi Power and Light Company (MP&L) which, in my view, warrant reversal of this case. I would reverse and render this case based on *Vines*.

¶71. In attempting to overrule *Vines*, according to the majority, a properly instructed jury may find that MP&L negligently created a hazardous condition by placing its utility pole precisely in a position 21' 6" off the traveled portion of Money Road. This position would allow a jury to find that such placement constituted a dangerous obstacle to drivers normally utilizing the roadway. The majority thus adheres to the premise that it was "reasonably foreseeable" by MP&L that reckless, "tight" drivers, who failed to maintain a proper lookout, failed to maintain proper control over their vehicles,

while driving at an excessive rate of speed, would ignore highway warning signs and most likely run off the roadway in a known dangerous 60 to 90 degree curve, leave 80 feet of tire skid marks on the pavement, fly airborne 45 feet, striking MP&L's improperly placed pole with such force that it would split into three separate pieces and then the vehicle would slide an additional 64 feet to its final resting place in a farmer's muddy cotton field.

¶72. Adopting Lumpkin's experts' opinion, the majority maintains that a jury should determine whether MP&L should have placed the pole in question at a different and safer location. However, the ultimate question then becomes: How can a company like MP&L ever predict where the driving patterns of this type of driver will lead when deciding upon a safe location in which to place its utility poles? The answer is no company would ever make such a prediction. Such is the folly of suggesting overruling *Vines*, which in my view, is good law.

¶73. The story does not end there. The Mustang automobile driven by Randy Tackett was occupied by teenagers. Tackett admittedly consumed four or five beers and was feeling "tight." Tackett failed to heed the sharp curve highway warning sign as well as the warnings of the other teens in his vehicle concerning the upcoming bad curve. Miraculously, no one was injured in the above described scenario. Immediately after the wreck, Tackett was busy gathering up and disposing of the evidence, i.e., throwing the remaining beer and empty beer cans in to a nearby creek. Fifteen year old Kristen Black exited the car and started towards the highway despite a warning from Heather Barry, who stated "Kristen, don't go up there. There's wires up there." Kristen told Heather that "she was just going to go up under them." Kristen continued to walk towards the highway and made contact with one of the energized downed wires and was severely injured. This case could easily be referred to as one of "cause and effect, chain of ev ents," which was significantly contributed to by Tackett's extremely negligent conduct. However, the jury, without benefit of Bob Marsh's testimony and further restricted by limited knowledge of the complete facts, found no negligence whatsoever, by Tackett.

¶74. And the story continues. Extensive discovery was conducted by all parties. MP&L responded to Lumpkin's Interrogatory No. 3 and listed Bob Marsh as an expert witness, who was expected to testify *inter alia* that the utility pole and power line were both constructed and maintained in accordance with generally accepted industry standards and in accordance with the National Electric Safety Code. In addition, Marsh was questioned extensively by plaintiff's counsel during a Rule 30(b)(6) deposition taken on November 12,1990, concerning the above related matters, issues of utility pole location, alternate pole locations, and foreseeability. *This deposition was conducted fourteen months prior to trial.* Lumpkin was completely informed concerning all factors of Marsh's upcoming testimony at trial.

¶75. At trial, Lumpkin offered expert witnesses who were allowed to testify that MP&L should have placed its utility pole at a different and safer location. Lumpkin's experts testified that a safer location for the utility pole would be to place it in front of the farmer's liquid ammonia nitrate tank in the cotton field, and this position was the only alternative placement for the pole that was ever suggested by the plaintiff's experts. A more dangerous placement could not possibly have been selected by the plaintiff's experts. Placement of the pole in front of a liquid ammonia nitrate tank, subjecting it to the possibility of a vehicle containing gasoline running over the light pole, splintering the pole into three pieces and bringing down the lines, then striking the ammonia tank, with the added possibility of a

spark from electrical lines, or alternatively, a fire from the vehicle's fuel line or gas tank, would set off an explosion of astronomical proportions. Plus, such placement was not possible according to the engineers.

¶76. However, the trial court excluded Marsh's relevant testimony on the issue of Tackett's driving conduct, foreseeability and pole location when Lumpkin's counsel claimed that he was being "ambushed " and surprised, because MP&L had not complied with Rule 26 (f)(1) and revealed in interrogatories all this information that Marsh would testify to at trial. The purpose of discovery is to eliminate trial by surprise and that discovery may be obtained by utilizing several different means. Lumpkin's counsel had thoroughly questioned Marsh on all of these important issues at deposition and could not possibly have been ambushed or surprised.

¶77. Thus, the expert testimony of the three plaintiff experts at trial went unrefuted on these critical issues. The only evidence that the jury was allowed to consider was that the pole in question was placed by MP&L in a location which constituted a hazardous placement. The plaintiff's expert supported this claim by testifying that there had been other vehicles that had run off the road in the curve and one vehicle had previously struck the guy wire on this pole.

¶78. Lumpkin's argument that the pole's placement constituted a hazard pales when compared to the fact that over three million vehicles had passed by the pole and not a single vehicle had struck the pole prior to this accident. This writer would assert that this fact alone absolutely supports the position of MP&L that the pole was in as safe a location as could possibly be determined. A reverse question could be posed back to the majority: At what other location could MP&L have placed the utility pole that would have insured that it would not be struck by an out-of-control, speeding, reckless or drunk driver? Common sense dictates the existing location was as **reasonably** safe as any other potential site. The lack of common sense suggestions of pole placement by Lumpkin's experts as adopted by the majority, warrants the re-naming of this issue as, "The pole that should not have been coming after Tackett's car."

¶79. Nevertheless, logic and fairness notwithstanding, the jury was precluded by the trial judge from hearing any evidence from Marsh concerning his opinion that it was an absolute impossibility to design a utility pole distribution system when required to consider drunk, reckless drivers and other variable factors being figured into an equation when attempting to predict _where_ an out-of-control driver _might_ run off a road. Obviously, at the time of trial, Lumpkin's counsel had been fully aware for fourteen (14) months of all matters that Marsh would testify to at trial. Accordingly, Lumpkin's counsel should not be allowed to be successful in his plea of surprise, ambush or prejudice. There is a glaring absence of any of these three factors affecting Lumpkin. Contrarily, MP&L was severely prejudiced by the trial court's denial of Marsh's testimony.

¶80. But, the saga continues with the trial court's precluding evidence of Tackett's consumption of alcohol. While I agree with the majority on this issue, I write further to emphasize this error. Plaintiff's counsel filed a motion _in limine_ to exclude any mention of Tackett's consumption of alcohol prior to the accident. The trial judge reasoned that since Tackett admitted negligence in that Jury Instruction P-7, which stated that Tackett admitted a violation of his [duty to exercise reasonable care in the operation of his automobile] in that he failed to maintain proper control, allowing the jury to consider any evidence of alcohol consumption would create unfair prejudice

against Tackett, substantially outweighing any probative value. The jury was not told the entire story of Tackett's negligence, which included: failure to maintain a proper lookout, failure to observe highway warning signs regarding the bad curve, failure to heed the warnings of fellow occupants of the vehicle regarding the bad curve, previous experience driving in that area as he had proceeded through the curve earlier that same evening, exceeding the 55 miles per hour speed limit, locking his brakes up, cutting his steering wheel. And perhaps the most relevant of all, the jury did not hear that he admitted consuming four to five beers and was "tight," and maybe affected "[a] little," but not drunk.

¶81. The trial court had difficulty finding relevance in Tackett's admission that he was "tight" when the accident occurred. Judge Graves stated, "I guess I'm having problems knowing what tight means." He determined the word "tight" was very nebulous. In his deposition, it was Tackett who selected the word by stating, "I would say tight; wasn't drunk." However, Tackett then admitted that the alcohol affected him "[a] little." Tackett appears to be attempting to "backstroke" out of a trap that he himself set. The word "tight" is a common, everyday, garden variety word, used frequently by the public at large to express an opinion that a person is intoxicated or under the influence of alcohol. More importantly, in the case *sub judice*, it was Tackett's chosen word to describe himself on the occasion of the accident. Admittedly, the word "tight" has several different meanings, one of which is, " full of liquor, intoxicated, drunken." ***Websters Third New Int'l Dictionary*** 2392 (1971). The word may have been nebulous to the trial judge, but it's not to Mr. Webster nor this writer because of the context within which it was used by Tackett in his response at deposition. The jurors, had they been allowed to hear the testimony concerning Tackett's use of the word "tight," in its entire context, could have reasoned that Tackett was intoxicated, thus more negligent than admitted to on the occasion of the accident. Had jurors been made fully aware of this factor, they could have determined that Tackett's intoxication was a relevant and material factor in causing the accident in question or at the very least that such factor may have added to the issue of contributory negligence of Kristen Black. This one factor alone overwhelmingly affected the outcome of this verdict. The trial court totally ignored that evidence of Tackett's being "tight" also went to foreseeability, to the degree of Tackett's negligence and proximate cause, and to Kristen Black's contributory negligence in knowingly riding with Tackett, who had consumed alcohol. The jury was entitled to decide this issue for themselves.

¶82. The finale of this story is the trial judge's interrogation of the jurors regarding their ambiguous verdict, conducted in open court in the presence of the parties and attorneys and without benefit of further instructions on the law. The proper course of action based on precedential case law is for the trial court to prepare additional instructions if necessary or advise that the jury has already received adequate instructions and send the jury back to continue its deliberations. The better course would have been for the judge to send the jury back to deliberate with a clearer question.

¶83. Having been now fully informed on the factual events and rulings of the trial judge, it should not shock the reader that the end result of this story was a jury verdict for Black, but finding MP&L 50% comparatively negligent in its utility pole placement, Black 50% contributorily negligent and Tackett *without fault* in causing the accident.

¶84. Considering Black's contributory negligence, the trial judge's rulings which unfairly hampered MP&L's defense, and the withholding from the jury of significant, relevant facts concerning Tackett's

negligence, the verdict was astounding. The resulting verdict in favor of Black and against MP&L in the amount of $750,000, with Tackett totally absolved of any negligence was unfair, fundamentally offensive, and obviously the result of prejudice or bias by the less than fully informed jury. Nevertheless, this unjust verdict against only MP&L without including Tackett was easily predictable, considering the trial judge's rulings and the mountain of critical and relevant evidence that the jury was not allowed to hear.

¶85. An analysis of each individual issue complained of by MP&L, examination and application of our appropriate case law, leads this writer to the conclusion that the majority is mistaken. This case should be reversed and rendered in favor of MP&L.

¶86. Lumpkin asks this Court to overrule *Vines v. Southwestern Miss. Elec. Power Ass'n*, 241 Miss. 120, 129 So. 2d 396 (1961) and the legion of cases forming the basis of the law dating back seventy-eight years to *Gulfport & Miss. Coast Traction Co. v. Manuel*, 123 Miss. 266, 85 So. 308 (1920) and the majority attempts to do so.

¶87. The facts in *Vines* are practically identical to the case at bar. Vines' accident occurred at 11:00 p.m., the same time as this accident occurred. In *Vines*, the driver admitted drinking two bottles of beer. Here Tackett admitted consuming either four or five beers. There were four occupants in the vehicle in *Vines* and five in this case. The driver in *Vines* was traveling 35 to 40 miles per hour in a curve to the left. Here Tackett admitted to exceeding 55 miles per hour in a sharp 60 to 90 degree curve to the left. The pole struck by the driver in *Vines* was located only three and one-half feet from the traveled portion of the roadway and had been struck twice before. Here the pole was located twenty-one feet and six inches from the roadway and had never been struck before, although the guy wire had been previously struck. In *Vines,* the driver left the traveled roadway and ran 150 feet down a ditch. Here, Tackett traveled 189 feet out of control, 45 feet of which was airborne, most likely the results of his greater speed and the four foot elevated roadbed. Both drivers struck utility poles breaking them and bringing down the power lines. In both cases, passengers were injured by walking into downed power lines. In *Vines* there was even evidence of a failed power steering system, yet no such vehicle mechanical failure exists in this case.

¶88. Readily obvious is that the actions of Tackett were much more egregious than those of the driver in *Vines*. What is also recognizable is that Tackett was not making an ordinary use of the roadway nor exercising reasonable care and caution. This Court, in *Vines*, stated:

> In the case at bar the pole was not within that portion of the right-of-way designed for public travel and no one making the ordinary use of the road and exercising reasonable care and caution would travel where the pole was located.

*Vines,* 241 Miss. at 128,129 So.2d at 399. The Court further noted that the driver was not making ordinary use of the roadway and cited a Tennessee Court of Appeals case which stated:

> The general rule established by the modern authorities is that a public utility company lawfully maintaining a pole in or near a public highway is not liable for the damage to a person or property resulting from a vehicle striking such pole, unless it is erected on the traveled portion of the highway or in such close proximity thereto as to constitute an obstruction dangerous to anyone properly using the highway, and the location of the pole is the proximate cause of the

collision.

*Vines,* 241 Miss. at 128, 129 So. 2d at 399 (quoting *Clayforn v. Tenn. Elec. Power Co.*, 101 S.W. 2d 492, 497). The majority apparently fails to observe that in this case, as was the situation in *Vines*, it is the driver's overall conduct amounting to multiple improper and negligent actions which constitute improper use of the highway. This Court granted a directed verdict in *Vines*. MP&L should have also been granted a directed verdict in this case.

¶89. The majority also attempts to utilize this Court's decision in *Spears v. Miss. Power & Light Co., Inc.*, 562 So. 2d 107 (Miss. 1990) as support for its position. *Spears* is distinguishable for several reasons. First, the *Spears* decision did not even involve the location of a utility pole placed along a public highway. The facts in *Spears* concerned an MP&L easement and right-of-way across a private business's parking lot and involved a driver invitee, who while concentrating on finding a parking place on a dark night, simply did not see the utility pole during a heavy rainstorm and struck the unmarked pole. Thus, the issue was totally different in that it dealt with the determination of what standard of care was owed to an invitee of the property owner who was injured when he collided with a dark, unmarked power pole owned by MP&L and which occupied a portion of the premises where traffic normally flowed. Even the majority admits the issue in *Spears* was different but, nonetheless the majority plows ahead citing the *Spears* questions: Whether the pole should have had lighting? Should the pole have been marked? Should the owner or MP&L have installed guard rails around the pole? Is the majority suggesting lighting and guard rails on every utility pole in this state? Whether the injury was foreseeable as to MP&L? Was there an obligation of the defendant to anticipate an injury? It is more than noteworthy that the *Spears* Court apparently did not find the facts sufficiently analogous enough to *Vines* to even mention that opinion, much less attempt to overrule it.

¶90. Next, the majority refers to §11-27-43 which states that power poles must be erected in accordance with the provisions of the NESC. The provisions state that utility poles shall be installed *and maintained* so as to reduce hazards to life as far as practical. Using the majority's view, it is absolutely reasonable to require that MP&L, on its miles and miles of power lines located along highway right-of-ways, mark all of the poles, install lights and guard rails to avoid creating an unreasonable risk or hazard to drivers normally using the roadway. The majority fails to note that there is a much greater likelihood of a vehicle driven by an invitee striking an unmarked, unlighted, unguarded utility pole in the middle of a business's private parking lot than it would be to foresee that an admittedly "tight" teenager, who had consumed four or five beers, exceeded 55 mph, failed to maintain proper control of his vehicle, failed to maintain a proper lookout, failed to heed a warning sign of a bad curve, failed to heed warnings from fellow occupants, would go airborne and strike a utility pole located 21 feet 6 inches off the highway.

¶91. Common sense dictates the necessity of public utilities utilizing highway right-of-ways to enable electricity to be delivered to the thousands of citizens of this State. The system denotes a dual use of one existing right-of-way, thereby decreasing the overall costs of unnecessary re-routing of electrical distribution systems. Both the Legislature and this Court have recognized the prevailing public interest served by this system. This Court, in *Vines* noted with approval "the public interest served in the use of the streets for the erection of utility poles." *Vines* 241 Miss. at 127, 129 So. 2d at 398. The *Vines* Court further stated:

The legislature has recognized this public interest in connection with the use of highways in rural areas by enactment of the statutes cited above.

*Id.* Also, in *City Council of Greenville v. Thomas*, 241 Miss. at 633, 131 So. 2d 659 (1961), this Court stated:

The declared policy of this State, as evidenced by such statutes [citations omitted] is to encourage the development of the public utilities by affording them the right to place their lines along the streets and highways.

*Id.* at 644, 131 So. 2d at 662.

¶92. However, this dissent recognizes what the majority apparently does not, that this dual system of use of a highway right-of-way for highway purposes and electrical distribution poles may co-exist without danger or interference to the other. And yet, by the same token, neither may utilize their rights in a manner as to wantonly injure the other. This Court, in *Mississippi Power & Light Co. v. Dulaney*, 239 Miss. 460, 123 So. 2d 845 (1960), stated:

The appellee had the right to such reasonable use of the streets for its poles and wires as the conditions existing at the time in the community warranted. On the other hand, the appellant had the reciprocal right to what was a reasonable use of the streets on his part. The rights of the appellant and the appellee are mutual and reciprocal. Neither could so use his own rights as to wantonly injure the other. These two correlative rights, *if the law is obeyed*, operate in perfect harmony with each other. There are no interferences, and no vacancies in the sphere of their harmonious movement.

*Id.* at 468-69, 123 So. 2d at 846(emphasis added)(quoting *Temple v. McComb Elec. Light and Power Co.*, 89 Miss.1, 42 So. 2d 874. A driver making normal use of the roadway is clearly one who is obeying the law, exercising reasonable care and caution and traveling upon that portion of the highway right-of-way designated for public travel. Contrarily, out-of-control drivers such as Tackett, who are violating every conceivable rule of care, throwing caution to the wind, whereupon they fly airborne 45 feet and strike a utility pole on the outer extreme edge of the right-of-way, as are this case, are certainly not making normal use of the roadway. It is absurd to suggest that MP&L under these circumstances has ignored foreseeability of an accident, and created an unreasonable risk of harm, by placing its pole so as to wantonly injure Black. It was error to grant Instruction P-4 and deny MD-15 and MD-12. A directed verdict for MP&L was proper and should have been granted by the trial judge. On this issue alone, I would reverse and render for MP&L.

¶93. I also respectfully disagree with the majority concerning the granting of Instruction P-6, which submitted the issue of public nuisance to the jury. The majority holds that the trial court properly allowed the public nuisance instruction, citing as support, approved language in *McKay v. Boyd Const. Co., Inc.,* 571 So. 2d 916, 921-22 (Miss. 1990) wherein this Court stated:

There is a general agreement upon the proposition that any permanent, fixed or stationary object or impediment, as distinguished from a mere temporary obstruction incidental to a lawful use of the way, which unreasonably and unnecessarily interferes with public travel, or which endangers the safety of travelers, constitutes a public nuisance per se. . . .

* * *

39 AM. JUR. 2d HIGHWAYS, STREETS, AND BRIDGES, § 274, pp. 661-62 (1968) (emphasis added).

¶94. *McKay* cites *United Gas Pipe Line Co. v. Jones*, 236 Miss. 471, 111 So. 2d 240 (1959), which was Lumpkin's sole authority for submitting the public nuisance theory to the jury. *McKay* and *Jones* are factually distinguishable from the case at bar.

¶95. In *McKay*, two year old Timothy McKay was the sole survivor in a vehicle driven by his mother. The driver strayed slightly to the left on U.S. Highway 49, a four-lane divided highway and struck head-on the blunt edge of the concrete abutment of a bridge. The abutment was located 23 inches from the traversed portion of the access road. *Id.* at 917-18. McKay filed suit against the contractor of the bridge, Boyd Construction Company and the Mississippi State Highway Commission. Summary judgment was granted to both defendants. The *Jones* decision was cited by the appellants in *Vines*, and rejected by this Court which stated, "We do not think the *Jones* case is applicable." *Vines*, 241 Miss. at 129, 129 So. 2d at 399. This dissent has already shown that *Vines* is virtually identical to the facts in the case *sub judice* and the differences strongly favor MP&L. In *Jones*, the facts revealed that a passenger was killed when the vehicle in which he was riding struck United Gas Pipe Line's concrete marker. The vehicle, moments before impact had been traveling 90 mph, but due to a plea by an occupant to slow down, the vehicle was traveling 55 to 60 mph as it entered the curve. The highway right-of-way was 60 feet wide, the traveled portion of the roadway was 18 feet wide and United's 2 ½ foot high concrete marker was located only 3 to 3 ½ feet from the black top pavement. The marker was obscured from view by sedge grass.

¶96. The majority cannot seriously contend that the facts above mentioned are analogous to the case *sub judice*. Even the *Jones* Court itself distinguished the pipeline marker in that case from electric utility pole cases. Referring to the *Manuel* and *Sellers* cases, the *Jones* Court stated:

> But the facts in each of those cases were entirely different from the facts shown by the record in this case. Those cases involved injuries resulting from collisions with the poles of electric power companies which could be readily seen from a distance by motorists approaching from ether direction along the highway.

*Jones*, 236 Miss. at 499, 111 So. 2d at 251. Returning to the case at bar, Tackett's claim that "he never saw MP&L's utility pole even as the car drove through it," is thinly disguised. The pole was 35 feet long, unobstructed and located down a 4 foot raised highway bed, 21 feet 6 inches from the shoulder of the road and at the very outer limits of the highway right-of-way. Exhibit 26, a photograph of the pole, clearly demonstrated these facts. Put very simple, this Court, in the case *sub judice* is not confronted with a 2 and ½ foot high concrete marker, obscured by tall grass and located a mere 3 feet from the shoulder of the road, as in *Jones*. Nor is this Court confronted with a portion of a bridge located a mere 23 inches from the shoulder of the highway, as in *McKay*. This Court is not even confronted with a utility pole being located 3 and ½ feet to 4 feet from the shoulder of the roadway, as in *Vines*.

¶97. *Vines*, again should control where this Court, discussing the principle of liability of a public utility for damage resulting from an automobile collusion with its utility pole, stated that there is no

liability, "unless it is erected on the traveled portion of the highway or in such close proximity thereto as to constitute an obstruction dangerous to anyone properly using the highway, and the location of the pole is the proximate cause of the collision." *Vines*, 241 Miss. at 128-29,129 So. 2d. at 399.

¶98. There are other factors in *Vines* along with that Court's language in addressing them which further add strong support to MP&L's argument and this dissent. The power line from the broken pole fell into the roadway. Vine's expert witness, as did the plaintiff's expert in this case, testified that the poles and lines were not built and maintained according to the requirements of the National Bureau of Standards. The *Vines* Court stated:

> In our view of the expert's testimony, it is not shown thereby that there was a violation of these rules. The testimony of this witness that the lines were dangerous does not make this a jury case. Whether the particular facts made it a jury case is a question of law which cannot be varied by an expert witness in a case of this kind.

*Vines*, 241 Miss. at 129-30, 129 So. 2d at 399. Also noteworthy in addressing the issue of the lines falling into the roadway and the contention by Vine's expert that adding another pole would have eliminated this hazard, the *Vines* Court stated:

> We do not think the utility must guard against dangers resulting from vehicles leaving the traveled portion of the highway and knocking down the power poles, as already stated. Moreover, if the lines are knocked down, they must fall some place. *If they had fallen on the automobile, the danger may have been greater. The fact that they fell in the highway was not the proximate cause of the death of Vines.* **The sole proximate cause was the manner in which the automobile was driven.**
>
> Appellants showed that prior to the accident in question, a motorist had lost control of his automobile and struck the same pole. They also offered to prove another person had struck the pole some time before. *We are of the opinion that the fact of prior accident does not change what has been said.* **The fact remains that anyone striking the pole was not lawfully and properly using the road. The evidence and the photographs clearly show that anyone making the ordinary and proper use of the highway would not strike this pole.**

*Vines*, 241 Miss. at 130, 129 So. 2d at 399-400 (emphasis added). Instruction P-6 was so vague and general that the jury would have probably found against MP&L, no matter what set of facts was presented. It was error to give such an instruction in view of *Vines*.

¶99. We now turn to an analysis of the trial court's failure to allow the jury to hear evidence of Tackett's consumption of alcohol. While I agree with the majority on this issue, nevertheless, I write further for clarification. Tackett admitted negligence, yet this does not warrant exclusion of evidence under Rule 403. *U.S. v. Lowe*, 569 F. 2d 1113 (10th Cir. 1978). Rule 403, an extraordinary remedy, should be used sparingly and only where a balancing test is conducted by the trial court to determine whether the probative value is substantially outweighed by the danger of unfair prejudice. *S.E.C. v. Peters*, 978 F.2d 1162,1171 (10th Cir. 1992)(citation omitted).

¶100. We note at the outset, that although the trial court ruled, it failed to conduct any balancing test. Thus, there is no way for this Court to determine what factors, if any, were considered by the trial

court in arriving at its decision that the prejudicial effect of Tackett's alcohol consumption substantially outweighed any probative value. The trial court does not have the prerogative of determining whether or not to conduct a balancing test and then fail to state the reasons for his ruling on the record. In *Foster v. State*, 508 So. 2d 1111 (Miss. 1987), this Court held:

> Thus, a trial court presented with a Rule 403 objection to relevant evidence must engage in a balancing process. The more probative the evidence is, the less likely it is that a 403 factor will be of sufficient consequence to *substantially* outweigh the probative value. . . .

> If one or more of the 403 considerations slightly outweigh probative value, the evidence still must be admitted. To tip the scale is not enough. The 403 factors must, in the language of the rule, "*substantially outweigh*" probative value before the evidence may be excluded.

*Foster*, 508 So. 2d at 1117 (emphasis added). In *Watts v. State*, 635 So. 2d 1364 (Miss. 1994), this Court stated:

> Even with a finding of admissibility under Rule 404(b), however, it remains clear that the required balancing test of Rule 403 was never conducted.

*Watts*, 635 So. 2d. at 1368. More recently, in *Ellis v. State*, 661 So. 2d 177, 184 (Miss. 1995), this Court reaffirmed the mandatory aspects of Rule 403 wherein the Court noted with approval the trial court's specific findings under the Rule 403 balancing test on the record.

¶101. Commencing the specific analysis, we find three substantial reasons why Tackett's admissions concerning alcohol use was admissible for the jury's consideration. First, Tackett's admission of drinking and of being "tight" went to the issue of foreseeability. The denial of Marsh's testimony prevented MP&L from presenting to the jury the issue of whether MP&L could reasonably be expected to foresee in designing its electrical transmission system and determining the location of its utility poles, that out-of-control, drinking drivers might leave the roadway and strike MP&L's poles. Nor did the jury hear Marsh's opinion that such a distribution system could not be designed, given such variables. Nor did the jury hear the plaintiff's expert witness, Hibbitt Neel's proffered testimony on this issue. MP&L's counsel, referring to Tackett, asked Neel, "Does his having been drinking along with other factors that you've mentioned make it harder to predict where his car would have gone off the road?" Neel replied, "Yes."

¶102. Tackett's drinking, in addition to the stipulated negligence, went also to the degree of negligence and to whether his negligence was the sole proximate cause of the accident. Miss. Code Ann. § 85-5-7 (1991) allows for determination of percentage of fault in a civil case. The jury never heard the complete truth concerning Tackett's negligence on the night of the accident. ***The only negligence by Tackett that the jury was allowed to consider was Tackett's negligence in failure to control his vehicle.*** The trial court erred in denying MP&L the opportunity to argue that its negligence, if any, was certainly less than Tackett's. In *Allen v. Blanks*, 384 So. 2d 63 (Miss. 1980), this Court stated:

> It is a fact capable of judicial notice that consumption of even small quantities of alcohol may significantly, albeit "imperceptibly," impair reaction time. Where split seconds are critical, even a very slight impairment of reaction time may spell the difference between accident or no

accident, <u>between proximately contributing negligence or the lack of it.</u>

*Allen*, 384 So. 2d at 67. (emphasis added). The jury remained in the dark concerning this important fact, and the jury did not know that Tackett violated the law in purchasing or possessing beer. Miss. Code Ann. § 67-3-70 (1972). The denial of such evidence here is in marked contrast to the allowance of evidence to the jury in *Jones*, "that the defendant B.J. Townsend, was negligent in permitting his son, Paul B. Townsend, who was only 14 years of age, to operate his car on the highway, . . . that the said Paul B. Townsend did not have a driver's license and could not get a driver's license due to his age." *Jones*, 236 Miss. at 482, 111 So. 2d at 242. Returning to this case, the jury, precluded from hearing all relevant evidence, was effectively prevented from fully assessing Tackett's degree of negligence as to whether it was a contributing factor or sole proximate cause of the injuries sustained by Black.

¶103. Finally, Tackett's consumption of alcohol was certainly relevant to Black's contributory negligence. The jury determined that Black was 50% contributorily negligent by her actions in ignoring warnings about the downed electrical wires, acknowledging the wires were there but, nevertheless proceeding to walk up under them. Evidence of Black having knowingly continued to ride in an automobile with Tackett, who had been drinking was permissible and relevant. This Court, in *Hill v. Dunaway*, 487 So. 2d 807 (Miss. 1986), allowed and approved of a jury instruction on this issue. The *Hill* Court stated:

> The operative point, however, is that a party to an action is entitled to have the jury instructed regarding a genuine issue of material fact, <u>viz</u> the Plaintiff's contributory negligence <u>vel non</u>, so long as there is credible evidence in the record which would support the instruction.

*Id.* at 809. *See also*, *Jones v. Pacific Gas & Elec. Co.*, 285 P. 709 (Cal. Dist. Ct. App. 1930)(where a guest passenger who was fully aware that the driver of the vehicle was under the influence of intoxicating liquor was injured when the automobile within which he was riding struck a utility's power pole, the court held contributory negligence to be proper and the passenger guilty.) The trial court erred in failing to allow this relevant evidence to be considered by the jury.

¶104. I respectfully concur in part and dissent in part.

**PRATHER, C.J., AND ROBERTS, J., JOIN THIS OPINION.**